# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued September 21, 2010          Decided April 1, 2011

No. 09-1307

CSI AVIATION SERVICES, INC.,
PETITIONER

v.

UNITED STATES DEPARTMENT OF TRANSPORTATION AND
RAYMOND L. LAHOOD, SECRETARY,
RESPONDENTS

———

On Petition for Review of an Order
of the Department of Transportation

———

*David M. Hernandez* argued the cause and filed the briefs for petitioner.

*Mary F. Withum*, Senior Trial Attorney, U.S. Department of Transportation, argued the cause for respondents. With her on the brief were *Robert B. Nicholson* and *Kristen C. Limarzi*, Attorneys, U.S. Department of Justice, *Paul M. Geier*, Assistant General Counsel, U.S. Department of Transportation, and *Peter J. Plocki*, Deputy Assistant General Counsel.

Before: SENTELLE, *Chief Judge*, TATEL and GRIFFITH, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* GRIFFITH.

GRIFFITH, *Circuit Judge*: The Department of Transportation ordered CSI Aviation Services, Inc., to cease and desist from acting as a broker of air-charter services for the federal government. Because the agency failed to justify its authority to issue the order, we grant CSI's petition for review.

I

Since 2003, CSI has been under contract with the General Services Administration (GSA) to broker air-charter service for various federal agencies. On March 10, 2009, CSI won a competitive bid to renew its status as a GSA contractor through 2014. A few days prior, on March 6, the Department of Transportation (DOT) sent CSI a letter requesting information to determine whether the company was engaging in "indirect air transportation" without the certificate of authority required by the Federal Aviation Act, 49 U.S.C. § 41101(a).

After the company provided the requested information, DOT sent another letter, stating that it had "review[ed] the information submitted by CSI" and "consult[ed] with GSA." Letter from Samuel Podberesky, Assistant Gen. Counsel for Aviation Enforcement Proceedings, DOT, to David M. Hernandez, Counsel for CSI (Oct. 16, 2009) [hereinafter Oct. 2009 Letter to CSI]. The letter then declared:

> Based on this information, CSI has been acting as an unauthorized indirect air carrier in violation of section 41101 with respect to business transacted via its GSA schedule listing. Violations of section 41101 also

constitute unfair and deceptive practices and unfair methods of competition in violation of 49 U.S.C. § 41712.

Violations of these provisions subject CSI and its principals to the assessment of civil penalties . . . of up to $27,500 for each violation. Each day such violation continues is a separate violation.
. . . .
. . . Accordingly, CSI is warned to cease and desist from any further activity that would result in it engaging in indirect air transportation. If CSI immediately ceases from entering into new contracts pursuant to the GSA schedule, and ceases all its activities governed by existing GSA contracts within 180 days from the date of this letter, we will refrain from taking enforcement action regarding its past violations as discussed above.

*Id.*

Six other companies received similar letters. All six complied by terminating their status as contractors for GSA. CSI alone chose to challenge DOT's determination, asking the agency to withdraw the cease-and-desist letter on the grounds that the Act requires a certificate of authority only for companies that operate "as a common carrier," 49 U.S.C. § 40102(a)(25), and that CSI's charter flights for the federal government are not common carriage. Letter from David M. Hernandez, Counsel for CSI, to Samuel Podberesky, Assistant Gen. Counsel for Enforcement Proceedings, DOT (Nov. 19, 2009).

On November 25, 2009, seeking another way to avoid shutting down its operations, CSI also submitted a petition to DOT for an emergency exemption from the certification

requirement. In support of CSI's petition, GSA wrote to DOT explaining at length why the Act's certification requirements for common carriage make no sense for government contracts. "Acquisition [of air service] by the Federal Government . . . is distinct in several ways from acquisition in the private sector and does not present the consumer protection related concerns typically at issue in the private sector." Letter from Kris E. Durmer, Gen. Counsel, GSA, to Robert S. Rivkin, Gen. Counsel, DOT (March 1, 2010). "There are a number of ways in which the Federal agencies that purchase air charter broker services . . . are protected from unscrupulous contractors." *Id.*

DOT granted CSI a temporary exemption that was scheduled to expire in April 2011. The exemption order, signed by the Assistant Secretary for Aviation and International Affairs, indicated that DOT "remain[ed] of the view that . . . the provision of air services for U.S. Government agencies through the GSA contracting system constitutes an engagement in air transportation, necessitating that brokers conducting such business hold economic authority from the Department to act as indirect air carriers." Final Order, Docket No. OST-2009-0311, at 4 (Apr. 14, 2010) (DOT).[1] In the meantime, CSI has continued to provide air service for GSA. CSI timely filed this petition for review in December 2009.

The central issue in this case is whether DOT properly concluded that air charter brokers that operate under GSA contract engage in indirect air transportation and so require

---

[1] The agency has since issued a one-year extension of the original exemption, which is now scheduled to expire on April 14, 2012. *See* Final Order, Docket No. OST-2009-0311 (Mar. 3, 2011) (DOT). The extension order does not revise the agency's position that GSA contractors require certification.

certification from DOT despite the statutory provision that requires certification only for those who provide air transportation "as a common carrier." Before reaching this issue, however, we must first consider whether DOT has taken a final legal position that is fit for judicial review and whether DOT's grant of an exemption for CSI has rendered this case moot.

II

The Federal Aviation Act provides that "a person disclosing a substantial interest in an order issued [under the Act] . . . may apply for review of the order by filing a petition for review" in this court. 49 U.S.C. § 46110(a). To avoid premature intervention in the administrative process, our review of agency action "has been judicially restricted to review of final agency orders." *Puget Sound Traffic Ass'n v. Civil Aeronautics Bd.*, 536 F.2d 437, 438-39 (D.C. Cir. 1976). The Supreme Court set the standard for finality in *Bennett v. Spear*, 520 U.S. 154, 178 (1997). An agency action is final when it marks "the 'consummation' of the agency's decisionmaking process" and is not merely of a "tentative or interlocutory nature." *Id.* at 178 (citations omitted). The action must be one in which "rights or obligations have been determined" or "from which legal consequences will flow." *Id.*

*Bennett* highlights the importance of avoiding disruption of the administrative decisionmaking process, but it does not foreclose all pre-enforcement challenges. Our most instructive case on this point is *Ciba-Geigy Corp. v. EPA*, 801 F.2d 430 (D.C. Cir. 1986), which we have recently described as "complementary" to *Bennett*. *Reckitt Benckiser, Inc. v. E.P.A.*, 613 F.3d 1131, 1137 (D.C. Cir. 2010). In *Ciba-Geigy*, an EPA official sent letters to twenty private companies directing

them to modify their pesticide labels. The letters stated that if the companies refused, the EPA would consider the pesticides "misbranded," leading to enforcement actions and penalties. Seventeen of the twenty companies complied but Ciba-Geigy resisted, claiming that the EPA was misreading its legal authority to allow it to bring a misbranding action before following the registration cancellation process required by statute. Facing the choice between costly compliance and the risk of prosecution, Ciba-Geigy filed a pre-enforcement lawsuit seeking injunctive and declaratory relief.

Noting that "an agency may not avoid judicial review merely by choosing the form of a letter to express its definitive position on a general question of statutory interpretation," *Ciba-Geigy*, 801 F.2d at 438 n.9, we held that the EPA's assertion of its statutory authority was reviewable final agency action for three reasons. First, the agency had taken a "definitive" legal position concerning its statutory authority. *Id.* at 436. Second, the case presented "a purely legal" question of "statutory interpretation." *Id.* at 435. In the absence of disputed facts that would bear on the statutory question, there was no benefit in waiting for the agency to develop a record before granting judicial review. And third, the agency's letter imposed an immediate and significant practical burden on Ciba-Geigy, ordering the company to "conform to the new labeling requirement on pain of civil and criminal penalties." *Id.* at 437.

All three factors from *Ciba-Geigy* are present here. First, DOT has issued a "definitive" statement of the agency's legal position. Its initial warning letter clearly took the position that air charter brokers under GSA contract require agency certification. The letter declared in no uncertain terms that "CSI has been acting as an unauthorized indirect air carrier in violation of section 41101." Oct. 2009 Letter to CSI. After

CSI protested and explained why it believed DOT to be misreading its statutory authority, the agency refused to change its legal position. Instead it issued an order granting CSI a temporary exemption from the certification requirement. The exemption order reiterated DOT's position that "the provision of air services for U.S. Government agencies through the GSA contracting system constitutes an engagement in air transportation, necessitating that brokers conducting such business hold economic authority from the Department to act as indirect air carriers." Final Order, Docket No. OST-2009-0311, at 4 (Apr. 14, 2010) (DOT). The warning letter and the exemption order taken together amount to a definitive statement of DOT's legal position. "Not only did the statement of position admit of no ambiguity, but it gave no indication that it was subject to further agency consideration or possible modification." *Ciba-Geigy*, 801 F.2d at 436-37.

Second, this case presents a "purely legal" question of statutory interpretation—whether an air charter broker operating as a GSA contractor is engaged in the provision of air transportation "as a common carrier" and therefore requires a certificate of authority. 49 U.S.C. § 40102(a)(25). In the absence of any disputed facts that would bear on this question, our review of the agency's legal position would not "benefit from a more concrete setting." *Ciba-Geigy*, 801 F.2d at 435. The legal question we review concerns the meaning of the Federal Aviation Act, which is antecedent to and distinct from whether CSI itself has violated the law.

And third, DOT has imposed an immediate and significant burden on CSI. The agency effectively declared the company's operations unlawful and warned the company "to cease and desist from any further activity that would result in it engaging in indirect air transportation." Oct. 2009 Letter

to CSI. At the very least, this cast a cloud of uncertainty over the viability of CSI's ongoing business. It also put the company to the painful choice between costly compliance and the risk of prosecution at an uncertain point in the future—a conundrum that we described in *Ciba-Geigy* as "the very dilemma [the Supreme Court has found] sufficient to warrant judicial review." 801 F.2d at 439. DOT's legal pronouncement was sufficiently burdensome to make six other GSA contractors terminate their air charter operations for fear of prosecution. Having thus flexed its regulatory muscle, DOT cannot now evade judicial review.

The government relies on *FTC v. Standard Oil Co. of California*, 449 U.S. 232 (1980), to argue that final agency action in a case like this one requires the completion of a full enforcement action. In light of *Ciba-Geigy*, however, this argument is mistaken. In *Standard Oil*, the FTC initiated an enforcement action upon finding "reason to believe" that Standard Oil's quasi-monopoly violated the Federal Trade Commission Act. *Id.* at 234. In the midst of the FTC's enforcement action, with key facts still in dispute, Standard Oil of California (Socal) filed a lawsuit arguing that the FTC lacked the requisite "reason to believe" the company had violated the law. The Court dismissed the case for lack of finality. *Id.* at 238.

*Standard Oil* differs from the present case in three key respects. First, unlike in this case, the FTC in *Standard Oil* did not definitively state its legal position. The FTC's stated finding of a "reason to believe" that Socal had violated the law was only a "threshold determination that further inquiry [was] warranted and that a complaint should initiate proceedings." *Id.* at 241. This contrasts sharply with DOT's definitive statement that "the provision of air services for U.S. Government agencies through the GSA contracting system

constitutes an engagement in air transportation," Final Order, Docket No. OST-2009-0311, at 4 (Apr. 14, 2010) (DOT), and that "CSI has been acting as an unauthorized indirect air carrier in violation of section 41101 with respect to business transacted via its GSA schedule listing," Oct. 2009 Letter to CSI.

Second, the petition in *Standard Oil* did not raise a purely legal question that was amenable to immediate judicial review. Whether Socal had violated the law—and whether there was a "reason to believe" it had—depended on a large body of unresolved facts, best sorted out by the FTC with its expertise and fact-finding capability. In the presence of disputed facts, the case did not present a fully crystallized "legal issue . . . fit for judicial resolution." *Standard Oil*, 449 U.S. at 239 (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 153 (1967)). Granting Socal's petition for review would have been premature: it would have caused "interference with the proper functioning of the agency and [imposed] a burden [on] the courts." *Id.* at 242. Here, by contrast, we face a clean question of statutory interpretation with no disputed facts. There is no need to withhold review pending further factual development that might clarify the issue.

Third, the FTC's enforcement action against Socal did not impose the same magnitude of hardship that DOT has imposed on CSI. As the Supreme Court explained, the FTC's tentative determination that Socal might be violating the antitrust laws had no significant "effect upon [Socal's] daily business." *Id*. at 243. Here, however, DOT's legal position cast a shadow over CSI's customer relationships, tainted almost every aspect of its long-term planning, and impaired the company's ability to fend off competitors. Indeed, the very purpose of DOT's legal pronouncements, accomplished with six other companies, was to prompt CSI to shut down its

operations. Thus, whereas Socal had "the burden of responding to the charges made against it" in a formal hearing, *id*. at 242, CSI faced the more troubling question of whether it was willing to risk serious penalties in order to obtain such a hearing at all.

It is clear from *Standard Oil* that courts should take care not to inject themselves into fact-bound agency proceedings that have yet to produce any definitive legal conclusions. But this is not such a case. DOT took a definitive legal position denying the right of GSA contractors to continue operating without certification from the agency. This order imposed a substantial burden on CSI, and the disputed statutory authority underlying the order is fully fit for judicial review without further factual development.[2]

III

---

[2] Of course, whether an agency letter threatening enforcement action is subject to judicial review varies based on the circumstances. In *Reliable Automatic Sprinkler Co. v. Consumer Product Safety Commission*, 324 F.3d 726 (D.C. Cir. 2003), we found a lack of finality where the Commission sent a letter informing a sprinkler company that it "intended to make a preliminary determination that the [company's] sprinkler heads present[ed] a 'substantial product hazard.'" *Id.* at 729. That case is inapposite here because it lacked two key factors for reviewability. The letter was not definitive because the Commission had "yet to determine conclusively its jurisdiction to regulate; [] yet to determine whether the sprinkler heads present[ed] a 'substantial product hazard'; and [] yet to issue any compliance orders." *Id*. And, equally important, the question at issue there, whether sprinkler heads qualified as "consumer products" under the Consumer Product Safety Act, "clearly involve[d] the resolution of factual issues and the creation of a record," as well as the exercise of "agency expertise" prior to court involvement. *Id.* at 734.

DOT argues that this case is moot for two reasons. First, the agency "plans to hold a rulemaking on this subject [that] will most likely change the legal landscape that gave rise to the warning letter." Resp't's Br. 11-12. And second, the agency granted CSI a temporary exemption from the statutory certification requirement. In DOT's view, this exemption "superseded the Department's warning letter and completely resolved the controversy" before us. *Id.* at 10.

We reject DOT's mootness arguments. The agency's promised rulemaking has yet to occur, and CSI's exemption is merely temporary. Thus, DOT's assurances provide nothing more than the mere possibility that the agency might allow CSI to continue operating. If the agency does not see fit to change its legal position or extend CSI's exemption, the exemption will expire and the company will face the full force of the adverse legal determination that DOT has announced. This not only raises the specter of future harm to CSI, but actually harms the company now. CSI is in the business of bidding for air-travel contracts and arranging air-charter logistics, both of which require a substantial amount of advance planning. The daily difficulties of running such a business are amplified by the looming threat of a legal kibosh.

IV

We turn at last to the merits of CSI's petition. The fundamental question in reviewing an agency action is whether the agency has acted reasonably and within its statutory authority. The agency must not only adopt a permissible reading of the authorizing statute, but must also avoid acting arbitrarily or capriciously in implementing its interpretation. *See* 5 U.S.C. § 706(2). Among other things, this requires the agency to "take whatever steps it needs to provide an explanation that will enable the court to evaluate

the agency's rationale at the time of decision." *Pension Benefit Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 654 (1990).

In this case, DOT failed to explain why the Federal Aviation Act requires a certificate of authority for air charter brokers operating under GSA contract. The Act states that "an air carrier may provide air transportation only if the air carrier holds a certificate issued under this chapter." 49 U.S.C. § 41101(a). The term "air carrier" means "a citizen of the United States undertaking by any means, directly or indirectly, to provide air transportation." *Id.* § 40102(a)(2). DOT appears to have assumed that, as a broker of charter flights for the federal government, CSI was engaged in the indirect provision of "air transportation." But this reading failed to engage with the special statutory definition of that term. Under the relevant part of the statute, "air transportation" is defined to include "interstate air transportation," *id.* § 40102(a)(5), which in turn means the interstate "transportation of passengers or property by aircraft *as a common carrier for compensation*," *id.* § 40102(a)(25) (emphasis added).

"Common carrier" is a well-known term that comes to us from the common law. *See Try Scheidler v. Nat. Org. for Women, Inc.*, 537 U.S. 393, 402 (2003) (noting presumption in favor of following common law usage where Congress has employed a term with a well-settled common law meaning). The term refers to a commercial transportation enterprise that "holds itself out to the public" and is willing to take all comers who are willing to pay the fare, "without refusal." BLACK'S LAW DICTIONARY 226 (8th ed. 2004). Some courts have allowed that holding out on an all-comers basis to a limited segment of the public might be enough to qualify as a common carrier. *See Woolsey v. Nat'l Transp. Safety Bd.*, 993 F.2d 516 (5th Cir. 1993) (concluding that an air carrier had

acted "as a common carrier" in offering services pursuant to negotiated contracts to members of the music industry because it had "held itself out to the public or to a definable *segment* of the public as being willing to transport for hire, indiscriminately"). But whatever the particular test, some type of holding out to the public is the *sine qua non* of the act of "provid[ing]" "transportation of passengers or property by aircraft as a common carrier." 49 U.S.C. § 40102(a)(25), 41101.

In the present case, it appears that CSI has performed under its contract with the GSA as a dedicated service provider, not as a common carrier. Under the GSA contract, CSI provides charter service to government agencies only, not to all comers. Thus, within the scope of the contract, CSI does not appear to provide "transportation of passengers or property by aircraft as a common carrier." *Id.* § 40102(a)(25). If CSI is not a common carrier under its GSA contract, then it does not engage in "air transportation" and its services for GSA do not fall within the certification requirement of the Federal Aviation Act.

Perhaps one could argue that if a company is a common carrier in any aspect of its business, it necessarily acts "as a common carrier" in all aspects of its business. The more obvious reading of the statute, however, is that a company can segregate its operations, acting sometimes "as a common carrier" and sometimes not. Indeed, DOT itself has taken this approach in the past. In Advisory Circular No. 120-12A, "Private Carriage Versus Common Carriage of Persons or Property" (Apr. 24, 1986), the agency provided "guidelines for determining whether current or proposed transportation operations by air constitute private or common carriage," noting that "this distinction determines whether or not the operator needs economic authority as an 'air carrier' from

[DOT]," *id*. ¶ 1. The circular acknowledges that "[p]ersons operating as common carriers in a certain field" may be providers of "transportation for hire which they perform in other fields," as long as they can "show that the private carriage is clearly distinguishable from its common carriage business and outside the scope of its holding out." *Id*. at ¶ 4.h.

DOT failed to address this critical issue both in its cease-and-desist order and in its brief to this court. This failure is all the more baffling because CSI twice informed DOT that it does not believe it is covered by the "air transportation" portion of the Federal Aviation Act—once in CSI's letter to DOT dated November 19, 2009, and again in CSI's brief before this court. Yet DOT's brief inexplicably claims, "It is undisputed that CSI's service is indirect air transportation." Resp't's Br. at 13-14. Not only is this a disputed point, it is at the very heart of the present controversy.

Given DOT's complete failure to explain its reading of the statute, we find it impossible to conclude that the agency's cease-and-desist order was anything other than arbitrary and capricious, and hence unlawful. Where we "cannot evaluate the challenged agency action on the basis of the record before [us], the proper course . . . is to remand to the agency for additional investigation or explanation." *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985). It appears to us that the law cannot support DOT's interpretation, but we leave open the possibility that the government may reasonably conclude otherwise in the future, after demonstrating a more adequate understanding of the statute.

V

For the foregoing reasons, the petition for review is

*Granted.*