Opinion for the Court filed Per Curiam, in which Circuit Judge BROWN joins as to Parts I, II, III, and V.
Concurring opinion as to Part IV filed by Circuit Judge BROWN.
PER CURIAM:
This case involves subjects often associated with controversy and temptation: alcohol, tobacco, and taxes. But the case turns on some fairly straightforward issues of statutory interpretation, not sin.
. Gulf Coast Maritime Supply, Inc. (“Gulf Coast”) had a tobacco export warehouse permit (the “tobacco permit”), and separate permits to import and wholesale alcohol (the “alcohol permits”). Essentially, these permits immunize Gulf Coast from penalties—and in the case of tobacco, taxes as well—on the unauthorized sale of tobacco or alcohol. ■ Both permits require the Alcohol and Tobacco Tax and Trade Bureau (“TTB”) to be informed of “any” ownership change. See J.A. 58 (tobacco permit); J.A. 70 (alcohol permit). Though the alcohol and tobacco permits are governed under different laws, their punchlines are the same: Failurp to report any change in ownership, without an application for a new permit within 30 days of the ownership change, results in the permit’s automatic termination. See 27 U.S.C. § 204(g) (alcohol permit); 27 C.F.R. § 44.107 (tobacco permit).
Gulf Coast did not inform TTB when Gulf Coast’s President/Director died and his widow received all of his.Gulf Coast shares. TTB has no record of Gulf Coast applying for either a new tobacco or alcohol permit after his death. Indeed, Gulf Coast proceeded as if no ownership change occurred—continuing to use the. signature stamp of its deceased President/Director on reports submitted to TTB, After TTB sent a letter indicating that the unreported ownership change could subject Gulf Coast to civil and criminal penalties, and a separate letter indicating, that Gulf Coast was liable for unpaid, excise taxes for operating under the terminated tobacco permit, Gulf Coast went to district court seeking injunc-tive and declaratory relief. The district court held Gulf Coast’s tobacco permit remedies were barred by the Anti-Injunction Act (“ALA”), and that the district court lacked jurisdiction to review the alcohol permits’ automatic termination.
,We agree with the district court that, the ALA prohibits Gulf Coast’s attempt to restore its terminated tobacco permit. Gulf Coast can bring a refund suit if it disputes liability for unpaid excise taxes. We also affirm the district court’s holding that it lacked jurisdiction over Gulf Coast’s alcohol permit claim.
*126 I.
A

The Tobacco and Alcohol Permitting Schemes

Export warehouse permits issued by the Internal Revenue Service (“IRS”) afford tobacco exporters an exemption from federal excise taxes. See I.R.C. § 5704(b). In order to preserve one’s export warehouse permit, the proprietor must comply with TTB regulations. See id. One regulation relevant here is 27 C.F.R. § 44.107. This regulation outlines what a permitted “export warehouse proprietor” must do in the event “the issuance, sale, or transfer of the stock of a corporation ... results in a change in the identity of the principal stockholders exercising actual or legal control of the [corporation’s] operations.” Id. The regulation requires the “corporate proprietor” to “make application for a new permit” “within 30 days after the change [in principal stockholder identity] occurs.” Id. “[Otherwise,” the regulation says, “the present permit shall be automatically terminated at the expiration of such 80-day period.” Id. (emphasis added). If, however, the proprietor timely applies for a new permit, “the present permit shall continue in effect pending final action” on the new permit. Id. Though the regulation does not expressly provide for judicial review of a denied new permit application, the Internal Revenue Code authorizes refund actions. I.R.C. § 7422. Refund actions not only encompass claims against tax liability, but also issues that “hinge[ ] on precisely” whether one is liable for taxes—such as an entity’s entitlement to tax-exempt status. See, e.g., Alexander v. "Americans United," Inc., 416 U.S. 752, 762, 94 S.Ct. 2053, 40 L.Ed.2d 518 (1974).
A separate type of permit, not connected to tax exemptions, is required to import or purchase alcoholic beverages for resale. See 27 U.S.C. § 203. Alcohol permits are obtained through TTB; what the agency gives, it can suspend, revoke, or annul. See id. § 204(e). In addition, an alcohol permit “shall ... automatically terminate[ ]” if it is “leased, sold, or otherwise voluntarily transferred,” Id. § 204(g). If the alcohol permit is “transferred by operation of law or if actual or legal control of the permit-tee is acquired, directly or indirectly, whether by stock-ownership or in any other manner, by any person, then such permit shall be automatically terminated at the expiration of thirty days thereafter.” Id. Section 204(g), like its tobacco regulation analogue, provides a permittee with the ability to apply for a new alcohol permit within thirty days of the ownership change, see id., and such an application ensures “the outstanding basic permit ... continued] in effect until such application is finally acted on by the Secretary of the Treasury.” Id. Should the Secretary deny this application, the statute authorizes appeals to this court (or any other circuit court). Id. § 204(h).
As to both alcohol and tobacco permits, the law establishes a process to ensure: (1) TTB would be updated of any ownership changes; (2) permits would automatically terminate when an unreported ownership change occurs; and (3) the permit holder is capable of seamlessly continuing operation, despite ownership changes, because the outstanding permit remains in effect pending final action on a timely-submitted application for a new permit. Judicial review is available if a new permit is denied—a refund suit in the tobacco permit context, and an appeal to a circuit court in the alcohol permit context—and that review may include considering whether it was necessary to update TTB as to a change in ownership.
*127 Under both the tobacco and alcohol permit schemes, automatic termination is a distinctive means by which a permit ceases to operate. Both statutory frameworks reflect this, treating the automatic termination process separately from the process afforded to other forms of cessation.
In the tobacco permit context, automatic termination is governed by its own regulatory provision. 27 C.F.R. § 44.107 speaks only to the automatic termination process, and automatic termination is not referenced in other provisions governing the cessation of a tobacco permit. 26 U.S.C. § 5713(b) requires a “show cause” hearing before TTB can either suspend or revoke a tobacco permit, but makes no mention of automatic termination. See id. The APA, similarly, requires notice and an opportunity to be heard before a license is withdrawn, .suspended, revoked, or annulled— without any reference to automatic termination. See 5 U.S.C. § 558(c). Gulf Coast’s own tobacco permit identified automatic termination as one among several means by which the permit could cease to operate. See J.A. 58 (“This permit will remain in effect ... until suspended, revoked, automatically. terminated, or voluntarily surrendered, as provided by law and regulations.”).
The alcohol permit scheme also treats the automatic termination process separately. 27 U.S.C. § 204(g) sets automatic termination apart from a permit’s suspension, revocation, annulment, or voluntary surrendering. Compare id,, with § 204(e). Differences in an alcohol permit’s cessation leads to different postures for judicial review. As explained above, automatically terminated alcohol permits may be succeeded by new permits; if a new permit application • is denied, judicial review is available. This process is distinct from judicial review of revoked alcohol permits. See id. (conditioning revocations on “due notice and opportunity for [a] hearing” demonstrating that the proprietor “willfully violated any of the” permit’s conditions). Similar to its tobacco permit, Gulf Coast’s alcohol permit distinguishes automatic termination from other cessations, and explicitly states the statutory trigger for automatic termination. See J.A. 70.

B.

Gulf Coast’s Ownership Change

Gulf Coast operated a tobacco export warehouse in Houston, Texas, pursuant to a TTB permit; it also purchased alcohol products made available for resale at the same location. See J.A. 5-6. Sam Geller, Gulf Coast’s President/Director, passed away on August 2, 2013. J.A. 7 ¶ 23; 10 ¶42. In Gulf Coast’s district court complaint, it described Mr. Geller as “a principal stockholder of Gulf Coast who, as an owner, director, and officer, exercised actual and legal control over the operations of the corporation.” J.A. 13 ¶53, At the time of his death, Mr. Geller owned forty-five percent of Gulf Coast shares. J.A. 32; Approximately one month after Mr. Geller died, “Barbara Druss Geller was appointed Independent Executrix” of Mr. Geller’s estate. J,A. 13 ¶ 54. Ms. Geller, who also owned forty-five percent of' Gulf Coast’s shares before Mr. Geller’s passing, reached a partition agreement with Mr. Geller’s estate. Under the agreement, Ms. Geller “obtained the ownership of 100 percent of Gulf-Coast stock which” had previously been shared between her and Mr. Geller during his life. J.A. 13 ¶ 55. Despite Ms. Geller how possessing ninety percent of Gulf Coast’s shares and being the majority stakeholder, Gulf Coast continued to operate as if Mr. Geller was in charge. When TTB investigated whether an ownership change occurred after Mr. Geller’s death, it found Gulf Coast’s general manager still using Mr. Geller’s signature *128 stamp when filing TTB reports, J.A. 113 ¶ 8.
TTB informed Gulf Coast via letter that the Company’s failure to report the change in stock ownership automatically terminated its alcohol and tobacco permits, J.A. 72-73. The letter also noted Gulf Coast’s continued operation without active permits would result in tax liability, along with civil and criminal penalties. Id. TTB sent Gulf Coast a second letter over a month later, stating the Company owed $7,836,787.40 in taxes, penalties, and interest for operating without a valid tobacco permit. J.A. 76-76. The agency has yet to initiate tax collection proceedings against Gulf Coast, but Gulf Coast has yet to cease its alcohol and tobacco operations, pay the assessed taxes or penalties, or apply for new alcohol or tobacco permits.

c.

Proceedings Below

Gulf Coast filed an APA action in response to TTB’s correspondence, along with a request to enjoin the termination of its permits. TTB filed a motion to dismiss which the district court granted while also denying Gulf Coast’s injunction request. The district court said the AIA precluded Gulf Coast from attempting to restore its prior tobacco permit; “challengfing] the termination of its permits rather thap explicitly challenging the imposition of the excise taxes and fines” did not exempt Gulf Coast from the AIA’s bar. See J.A. 104. Moreover, the district court recognized Gulf Coast’s ability to bring a refund suit and, afterward, submit a new tobacco permit application. J.A, 106. As to. Gulf Coast’s alcohol permit, the district court held the APA provided it with no jurisdiction to .review the.permit’s automatic termination. J.A. 107-08. If Gulf .Coast desired judicial review, the Company would first have to apply for. a new alcohol permit under the applicable statute. See id. Gulf Coast appealed here, objecting as to the AIA’s application and contesting the district court’s lack of jurisdiction over the terminated alcohol permit. The Company did not, however, appeal the district court’s denial of its motion for injunctive relief.
II.
As the district court dismissed Gulf Coast’s claims based on a lack, of subject-matter jurisdiction, see Fed. R. Civ. P. 12(b)(1), we review the district court’s legal conclusions de novo. A motion to dismiss the complaint requires us to take ás trae all well-pled factual allegations within Gulf Coast’s complaint—while it also obligates us to disregard any legal conclusions, legal contentions couched as factual allegations, and unsupported factual allegations within the complaint. See, e.g., Food & Water Watch, Inc. v. Vilsack, 808 F.3d 906, 913 (D.C. Cir. 2015). Moreover, the court “may consider materials outside the pleadings in deciding whether to grant a motion to dismiss for lack of jurisdiction.” Jerome Stevens Pharms., Inc. v. FDA, 402 F.3d 1249, 1263 (D.C. Cir. 2006); see also Bell Atl. Corp. v. Twombly, 550 U.S. 544, 568 n.13, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (stating courts may “take notice of the full contents” of published documents “referenced in the complaint” (citing Fed, R. Evid. 201)).
III.
Pursuant to the AIA, “[n]o suit for the.purpose of restraining, the assessment or collection, of any tax [can be brought] in any court by any, person.” 26 U.S.C, § 7421(a). By prohibiting challenges to tax-related laws before those laws are enforced, the AIA “protects the Government’s ability to collect a consis *129 tent stream of revenue. Nat l Fed’n of Indep. Bus. v. Sebelius, 567-U.S. 519, 543, 132 S.Ct. 2566, 183 L.Ed.2d 450 (2012). A tax-related law can’ be challenged, only after the law is enforced, via a refund lawsuit. See id. Determining whether the AIA bars a tax-related lawsuit “requires a careful inquiry into the remedy sought, the statutory basis for that remedy, and any implication the remedy may have on [tax] assessment and collection.” Z St. v. Koskinen, 791 F.3d 24, 29 (D.C. Cir. 2015).
Here, Gulf Coast contends the AIA is inapplicable because the remedy it seeks does not impede tax collection. Gulf Coast wants its terminated tobacco permit restored—an action that would obviate TTB’s assertion of unpaid tobacco excise taxes.. The Company’s argument presupposes its tobacco permit was revoked, not automatically terminated, and Gulf Coast did not receive a certain due process. But the Company’s presuppositions do not describe what actually happened; “the statutory basis for [the] remedy” Gulf Coast seeks is inapplicable. See id.'
Gulf Coast’s theory of relief discards the difference between revocations and automatic terminations. Indeed, the Company’s briefs use those terms interchangeably. See, e.g., Gulf Coast Opening Br. 5 (stating, at the, start of the page’s first full paragraph, TTB “declared] the permits revoked,” only to say at the start of the next full paragraph that “TTB referenced its allegation that Gulf Coast’s export warehouse proprietor’s permit terminated. .,.” (emphasis added)). Yet the applicable statutes and regulations; as well as Gulf Coast’s own tobacco permit, treat “automatic termination” and “revocation” distinctly. This is not surprising—the two concepts are not the same. Compare Gar-nee’s Dictionaey op Legal Usage 344 (3d ed. 2011) (“If [a contract] ends because it’s cut short ... by a party’s act, it’s definitely called a termination,”), with id. at 786 (“Revoke = to annul by taking back”). The conceptual difference fits the procedural distinction. Requiring notice and an opportunity for a hearing before TTB determines one’s permit may be withheld (i.e., before it is revoked) makes sense. Logically, however, to insist on that same process when a party’s action already extinguished its right to -the permit {i.e., the permit automatically terminated) is a non sequi-tur.
Even if there were somé basis to treat the automatic termination of Gulf Coast’s tobacco permit like a revocation, restoring Gulf Coast’s terminated permit has a direct effect on the assessment and collection of taxes. As the Government rightly put it, by “seeking] to retroactively restore its tobacco permit[ ],” ■ “Gulf Coqst seeks to ... avoid[ ] past, present, and future tax liability.” Gov’t Br. 28. If Gulf Coast’s tobacco permit should never have been revoked in the first instance, either because there was no change in ownership or because Gulf Coast’s permit was improperly “revoked,” Gulf Coast was, properly, always tax-exempt. Restoring Gulf Coast’s old permit, as opposed to the Company applying for a new permit, voids ab initio any unpaid excise taxes on tobacco sales made during the period where Gulf Coast operated under its terminated permit.
When the remedy sought directly affects tax .collection, the suit is barred by the AIA. See, e.g., Fla. Bankers Ass’n v. U.S. Dep’t of Treasury, 799 F.3d 1065, 1070-71 (D.C. Cir. 2015) (stating, when “the obvious purpose of [the] suit[ ] was to reduce the payment of taxes,” the suit would violate the AIA). The “obvious pqr-pose” of imposing the statutory revocation process on automatic terminations is to restore Gulf Coast’s prior permit, absolv *130 ing it of tax liability. This “obvious purpose” directly impairs the collection of assessed taxes, barring the suit under the AIA.[1]
Accordingly, the AIA bars Gulf Coast’s attempt to restore its prior tobacco permit.
IV.
As with its tobacco-permit claim, Gulf Coast contends the APA affords it a right to notice and an opportunity to be heard before its alcohol permits may be revoked and insists that it may bring a claim challenging that revocation in district court. See Appellant’s Reply Br. 2 (“TTB revoked these permits without furnishing notice of claimed violations, and without providing an opportunity to demonstrate or achieve compliance with lawful requirements, as required by the APA, 5 U.S.C. § 558(c).”). However, the alcohol-permitting scheme set out in .27 U.S.C. § 204 takes the place of the APA’s license-revocation procedures and provides its own process for judicial review. Under Section 204, challenges to orders revoking alcohol permits must be brought in circuit court, not district court. Because Gulf Coast sought a determination that its permits were improperly “revoked,” the district court lacked jurisdiction to hear the company’s claim.
i.
Gulf Coast bases its claim on the APA, which provides that, in general, an agency may suspend or revoke a license only if it provides notice “in writing of the facts or conduct which may warrant the action” and offers an “opportunity to demonstrate or achieve compliance with all lawful requirements.” 5 U.S.C. § 558(c)(l)-(2). The company points out that it received no such process before its permits were, in its words, “revoked.” Appellant’s Br. 1. Gulf Coast further observes that agency decisions to revoke licenses (or permits) are typically subject to APA review. See, e.g., Atl. Richfield Co. v. United States, 774 F.2d 1193, 1199 (D.C. Cir. 1985); Colley v. James, — F.Supp.3d -, -, 2017 WL 2080246, at ”13 (D.D.C. May 15, 2017). As a result, Gulf Coast argues, it properly brought suit in district court under the APA, seeking to compel the agency to follow certain procedures before “revoking” the company’s permits.
The APA provides for “a broad spectrum of judicial review of agency action,” Bowen v. Massachusetts, 487 U.S. 879, 903, 108 S.Ct. 2722, 101 L.Ed.2d 749 (1988), but Congress did not intend this “general grant of review ... to duplicate existing procedures for review of agency *131 action” or “provide additional judicial remedies in situations where ... Congress has provided special and adequate review procedures,” id.; see Ctr. for Biological Diversity v. EPA, 861 F.3d 174, 186 (D.C. Cir. 2017) (“[W]here a special statutory review procedure exists, it is ordinarily supposed that Congress intended that procedure to be the exclusive means of obtaining judicial review in those cases to which it applies.” (alterations and internal quotation marks omitted)). An “alternative remedy is ‘adequate’ and therefore preclusive of APA review” if there is “ ‘clear and convincing evidence’ of ‘legislative intent’ to create a special, alternative remedy,” Citizens for Responsibility & Ethics in Wash. (CREW) v. U.S. Dep’t of Justice, 846 F.3d 1235, 1244 (D.C. Cir. 2017) (quoting Garcia v. Vilsack, 563 F.3d 519, 523 (D.C. Cir. 2009)), such as when Congress “provide[s] ... an alternative review procedure,” id. at 1245 (quoting El Rio Santa Cruz Neighborhood Health Ctr. v. U.S. Dep’t of Health & Human Servs., 396 F.3d 1265, 1270 (D.C. Cir. 2005)).
Here the Federal Alcohol Administration Act (FAAA) provides an adequate alternative remedy, “bar[ring] APA review.” CREW, 846 F,3d at 1245. Under the FAAA, the Treasury Department may suspend or revoke a permit “by order ... after due notice and opportunity for hearing” and must “state the findings which are the basis for the order.” 27 U.S.C. § 204(e). Following a suspension or revocation, the permittee can file an appeal in this court or in the federal court of appeals where its principal place of business is located. Id. § 204(h). Section 204 thus provides an “alternative review procedure” for alcohol-permit revocations, which demonstrates Congress’s intent to preclude APA review in that context. CREW, 846 F.3d at 1245. Because Congress has chosen to channel all alcohol-permit-revocation challenges through the courts of appeals under section 204, Gulf Coast cannot bring a revocation challenge in district court under the APA.
ii.
Importantly, Gulf Coast has repeatedly and forcefully made clear that it seeks only to challenge a revocation of its alcohol permits by the agency, based on the agency’s failure to provide the Company with certain process it was allegedly due. See, e.g., Appellant’s Reply Br. 1, 2, 4; Statement of Issues, ECF No. 1652649 (framing its challenge as one “to the revocation, by the [agency], of [the company’s] basic alcohol permits”). As we have explained, however, no revocation challenge may be brought in district court.
To be clear, the TTB’s letter to Gulf Coast is not a revocation of the Company’s alcohol permits. Far from it. As we see it, the letter is a formal notification to Gulf Coast that, in the agency’s view, the Company’s permits have automatically terminated and a warning that the company would be subject to penalties for continuing to operate. Thus, contrary to what the concurrence suggests, we in no way believe that this Court has jurisdiction under Section 204 over Gulf Coast’s claim that its permits were somehow “revoked.”
However, Gulf Coast’s argument to us for why the district court had jurisdiction is that its permits were revoked and that procedurally defective permit revocations can be challenged in district court. Because procedurally defective permit revocations cannot be challenged in district court, and because Gulf Coast has given us no other reason to reverse the district court, we deny the Company’s appeal.[2]
*132 We would-be confronted with a different question,- however, had Gulf Coast instead argued that it was challenging a determination by the agency that its permits had automatically terminated. See 27 C.F.R. § 44.107. In the past, we have found final agency action and allowed parties to bring pre-enforcement challenges under somewhat similar circumstances, .but based- on reasoning very different from the kind Gulf Coast advances here. For example, in CSI Aviation Services, Inc. v. U.S. Department of Transportation, 637 F.3d 408 (D,C. Cir. 2011), we concluded that we could review a letter warning the petitioner that it “ha[d] been acting as an unauthorized indirect air carrier in violation of [49 U.S.C.] section 41101” and that it must cease and desist or face civil penalties. Id. at 410. We explained that the letter was renewable, in part, because it represented the agency’s definitive position on the legality of the petitioner’s actions and because the letter “imposed an immediate and significant burden” on the petitioner by declaring its operations unlawful, among other reasons. Id. at 412. And in Ciba-Geigy Corp. v. EPA, 801 F.2d 430 (D.C. Cir. 1986), we concluded' that the district court could review a letter warning that if the appellant failed to revise the labels of a pesticide, the EPA would consider that pesticide mislabeled’and bring a misbranding action. Id. at 433. That letter, we explained, was reviewable because it reflected the agency’s definitive position on the lawfulness of the company’s conduct and warned that failure to “conform' to the new labeling requirement” could subject the company -to “civil-and criminal penalties.” Id. at 437.
Here, TTB’s letter informed Gulf Coast that
[A]s a result of the[ ] . unreported changes, per ... 27 U.S.C. § 204(g) ... Qulf Coast Maritime Supply, Inc. has been operating without the required permits since September 2013.... Because you lack the required permits, you are not authorized to engage in business as ... an alcohol beverage wholesaler or importer. Any continued operation as such subjects you to all applicable. .., [Federal Alcohol Administration] Act criminal and civil penalties.
J.A. 73 (emphasis added).
As in our earlier cases, this letter identifies how the agency understands the law fo apply to a particular party (Gulf Coast) and warns the party of legal consequences (civil and criminal penalties) that could follow if the party fails to comply with the agency’s view. Although some of the facts surrounding Gulf Coast’s purported ownership change may be in dispute, these cases could be read to suggest that Gulf Coast, had it proceeded differently, might have been able to bring an APA claim in district court to test the agency’s determination that an ownership change occurred and that the permits had therefore automatically terminated. Gulf Coast, however, made no such argument before us in response to the government’s jurisdictional challenge. And because the issue was not briefed, we- do not decide it. See Tao v. *133 Freeh, 27 F.3d 635, 641 n.7 (D.C. Cir. 1994).
The extent of Gulf Coast’s argument is that the APA allows challenges in district court to allegedly procedurally defective alcohol-permit revocations. That is simply not the case. Because we reject that argument, and because Gulf Coast has forfeited any other argument, we affirm the district court’s order finding that it lacked jurisdiction over Gulf Coast’s alcohol-permits claim.
y.
The district court was correct to conclude the AIA bars Gulf Coast’s attempt to restore its tobacco permit, and equally correct to conclude Gulf Coast’s sidestepping of the statutory scheme provides no jurisdiction over its alcohol permit claim.

Affirmed.

. Gulf Coast seeks to exempt itself from the AIA by relying on the Supreme Court’s decision in South Carolina v. Regan, 465 U.S. 367, 104 S.Ct. 1107, 79 L.Ed.2d 372 (1984). Regan provides an exception to the AIA's application when a lawsuit challenges a federal tax and the statute “has not provided an alternative remedy” to bringing an action in federal court. Id. at 378, 104 S.Ct. 1107. Gulf Coast misapprehends Regans import. First, and most simply, a refund suit challenging TTB’s change-in-ownership finding is an "alternative remedy.” As Gulf Coast’s liability for these assessed taxes “hinges on precisely the same legal issue as does its eligibility for [tax-exempt]” status under its tobacco permit, a refund suit would necessarily resolve the same issues presented here. See Alexander, 416 U.S. at 762, 94 S.Ct. 2053. Second, restoration of a prior permit is unavailable altogether in the automatic termination process; Gulf Coast's tax status, unlike South Carolina’s in Regan, is not why such relief is unavailable. Cf. Regan, 465 U.S. at 380, 104 S.Ct. 1107. Finally, if an automatic termination can result in a restored permit after judicial review, then an "automatic termination” is neither automatic nor a termination. Gulf Coast effectively asks us to excise automatic termination from the regulatory scheme, in the name of excusing Gulf Coast from tax liability. Nothing in Regan allows us to rewrite a regulation.

. Our concurring colleague is of course correct that the "conclusory label[s]” a party *132 invokes are irrelevant to whether we have subject-matter jurisdiction. Concurring Op. 133. We do not hold Gulf Coast’s use of the term “revocation” somehow gives this Court jurisdiction over the Company’s -claim under Section 204, In fact, we agree that this Coupt has no jurisdiction to hear an appeal under Section 204 over anything other than an order "denying an application for, or suspending, revoking, or annulling, a basic permit”— regardless of how the challenger labels it. All we have done here is reject Gulf Coast’s argument to us that procedurally defective revocations can proceed through district court under the-APA. That is reason-enough to reject Gulf Coast’s appeal and affirm the district court. ... .