# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued May 10, 2017          Decided August 11, 2017

No. 16-5350

GULF COAST MARITIME SUPPLY, INC.,
APPELLANT

v.

UNITED STATES OF AMERICA, ET AL.,
APPELLEES

Appeal from the United States District Court
for the District of Columbia
(No. 1:16-cv-01461)

*John M. Peterson* argued the cause for appellant. With him on the briefs were *Michael K. Tomenga* and *Peter J. Bogard*.

*Jennifer M. Rubin*, Attorney, U.S. Department of Justice, argued the cause for appellees. With her on the brief was *Jonathan S. Cohen*, Attorney.

Before: TATEL, BROWN, and GRIFFITH, *Circuit Judges*.

Opinion for the Court filed PER CURIAM, in which *Circuit Judge* BROWN joins as to Parts I, II, III, and V.

2

Concurring opinion as to Part IV filed by *Circuit Judge* BROWN.

PER CURIAM: This case involves subjects often associated with controversy and temptation: alcohol, tobacco, and taxes. But the case turns on some fairly straightforward issues of statutory interpretation, not sin.

Gulf Coast Maritime Supply, Inc. ("Gulf Coast") had a tobacco export warehouse permit (the "tobacco permit"), and separate permits to import and wholesale alcohol (the "alcohol permits"). Essentially, these permits immunize Gulf Coast from penalties—and in the case of tobacco, taxes as well—on the unauthorized sale of tobacco or alcohol. Both permits require the Alcohol and Tobacco Tax and Trade Bureau ("TTB") to be informed of "any" ownership change. *See* J.A. 58 (tobacco permit); J.A. 70 (alcohol permit). Though the alcohol and tobacco permits are governed under different laws, their punchlines are the same: Failure to report any change in ownership, without an application for a new permit within 30 days of the ownership change, results in the permit's automatic termination. *See* 27 U.S.C. § 204(g) (alcohol permit); 27 C.F.R. § 44.107 (tobacco permit).

Gulf Coast did not inform TTB when Gulf Coast's President/Director died and his widow received all of his Gulf Coast shares. TTB has no record of Gulf Coast applying for either a new tobacco or alcohol permit after his death. Indeed, Gulf Coast proceeded as if no ownership change occurred—continuing to use the signature stamp of its deceased President/Director on reports submitted to TTB. After TTB sent a letter indicating that the unreported ownership change could subject Gulf Coast to civil and criminal penalties, and a separate letter indicating that Gulf Coast was liable for unpaid excise taxes for operating under the terminated tobacco permit,

Gulf Coast went to district court seeking injunctive and declaratory relief. The district court held Gulf Coast's tobacco permit remedies were barred by the Anti-Injunction Act ("AIA"), and that the district court lacked jurisdiction to review the alcohol permits' automatic termination.

We agree with the district court that the AIA prohibits Gulf Coast's attempt to restore its terminated tobacco permit. Gulf Coast can bring a refund suit if it disputes liability for unpaid excise taxes. We also affirm the district court's holding that it lacked jurisdiction over Gulf Coast's alcohol permit claim.

**I.**

*A.*

*The Tobacco and Alcohol Permitting Schemes*

Export warehouse permits issued by the Internal Revenue Service ("IRS") afford tobacco exporters an exemption from federal excise taxes. *See* I.R.C. § 5704(b). In order to preserve one's export warehouse permit, the proprietor must comply with TTB regulations. *See id.* One regulation relevant here is 27 C.F.R. § 44.107. This regulation outlines what a permitted "export warehouse proprietor" must do in the event "the issuance, sale, or transfer of the stock of a corporation . . . results in a change in the identity of the principal stockholders exercising actual or legal control of the [corporation's] operations." *Id.* The regulation requires the "corporate proprietor" to "make application for a new permit" "within 30 days after the change [in principal stockholder identity] occurs." *Id.* "[O]therwise," the regulation says, "the present permit shall be *automatically terminated* at the expiration of such 30-day period." *Id.* (emphasis added). If, however, the proprietor timely applies for a new permit, "the

present permit shall continue in effect pending final action" on the new permit. *Id.* Though the regulation does not expressly provide for judicial review of a denied new permit application, the Internal Revenue Code authorizes refund actions. I.R.C. § 7422. Refund actions not only encompass claims against tax liability, but also issues that "hinge[] on precisely" whether one is liable for taxes—such as an entity's entitlement to tax-exempt status. *See, e.g.*, *Alexander v. "Americans United," Inc.*, 416 U.S. 752, 762 (1974).

A separate type of permit, not connected to tax exemptions, is required to import or purchase alcoholic beverages for resale. *See* 27 U.S.C. § 203. Alcohol permits are obtained through TTB; what the agency gives, it can suspend, revoke, or annul. *See id.* § 204(e). In addition, an alcohol permit "shall . . . automatically terminate[]" if it is "leased, sold, or otherwise voluntarily transferred." *Id.* § 204(g). If the alcohol permit is "transferred by operation of law or if actual or legal control of the permittee is acquired, directly or indirectly, whether by stock-ownership or in any other manner, by any person, then such permit shall be automatically terminated at the expiration of thirty days thereafter." *Id.* Section 204(g), like its tobacco regulation analogue, provides a permittee with the ability to apply for a new alcohol permit within thirty days of the ownership change, *see id.*, and such an application ensures "the outstanding basic permit . . . continue[s] in effect until such application is finally acted on by the Secretary of the Treasury." *Id.* Should the Secretary deny this application, the statute authorizes appeals to this court (or any other circuit court). *Id.* § 204(h).

As to both alcohol and tobacco permits, the law establishes a process to ensure: (1) TTB would be updated of any ownership changes; (2) permits would automatically terminate when an unreported ownership change occurs; and (3) the

permit holder is capable of seamlessly continuing operation, despite ownership changes, because the outstanding permit remains in effect pending final action on a timely-submitted application for a new permit. Judicial review is available if a new permit is denied—a refund suit in the tobacco permit context, and an appeal to a circuit court in the alcohol permit context—and that review may include considering whether it was necessary to update TTB as to a change in ownership.

Under both the tobacco and alcohol permit schemes, automatic termination is a distinctive means by which a permit ceases to operate. Both statutory frameworks reflect this, treating the automatic termination process separately from the process afforded to other forms of cessation.

In the tobacco permit context, automatic termination is governed by its own regulatory provision. 27 C.F.R. § 44.107 speaks only to the automatic termination process, and automatic termination is not referenced in other provisions governing the cessation of a tobacco permit. 26 U.S.C. § 5713(b) requires a "show cause" hearing before TTB can either suspend or revoke a tobacco permit, but makes no mention of automatic termination. *See id.* The APA, similarly, requires notice and an opportunity to be heard before a license is withdrawn, suspended, revoked, or annulled— without any reference to automatic termination. *See* 5 U.S.C. § 558(c). Gulf Coast's own tobacco permit identified automatic termination as one among several means by which the permit could cease to operate. *See* J.A. 58 ("This permit will remain in effect . . . until suspended, revoked, automatically terminated, or voluntarily surrendered, as provided by law and regulations.").

The alcohol permit scheme also treats the automatic termination process separately. 27 U.S.C. § 204(g) sets

automatic termination apart from a permit's suspension, revocation, annulment, or voluntary surrendering. *Compare id., with* § 204(e). Differences in an alcohol permit's cessation leads to different postures for judicial review. As explained above, automatically terminated alcohol permits may be succeeded by new permits; if a new permit application is denied, judicial review is available. This process is distinct from judicial review of *revoked* alcohol permits. *See id.* (conditioning revocations on "due notice and opportunity for [a] hearing" demonstrating that the proprietor "willfully violated any of the" permit's conditions). Similar to its tobacco permit, Gulf Coast's alcohol permit distinguishes automatic termination from other cessations, and explicitly states the statutory trigger for automatic termination. *See* J.A. 70.

*B.*

*Gulf Coast's Ownership Change*

Gulf Coast operated a tobacco export warehouse in Houston, Texas, pursuant to a TTB permit; it also purchased alcohol products made available for resale at the same location. *See* J.A. 5–6. Sam Geller, Gulf Coast's President/Director, passed away on August 2, 2013. J.A. 7 ¶ 23; 10 ¶ 42. In Gulf Coast's district court complaint, it described Mr. Geller as "a principal stockholder of Gulf Coast who, as an owner, director, and officer, exercised actual and legal control over the operations of the corporation." J.A. 13 ¶ 53. At the time of his death, Mr. Geller owned forty-five percent of Gulf Coast shares. J.A. 32. Approximately one month after Mr. Geller died, "Barbara Druss Geller was appointed Independent Executrix" of Mr. Geller's estate. J.A. 13 ¶ 54. Ms. Geller, who also owned forty-five percent of Gulf Coast's shares before Mr. Geller's passing, reached a partition agreement with

Mr. Geller's estate. Under the agreement, Ms. Geller "obtained the ownership of 100 percent of Gulf Coast stock which" had previously been shared between her and Mr. Geller during his life. J.A. 13 ¶ 55. Despite Ms. Geller now possessing ninety percent of Gulf Coast's shares and being the majority stakeholder, Gulf Coast continued to operate as if Mr. Geller was in charge. When TTB investigated whether an ownership change occurred after Mr. Geller's death, it found Gulf Coast's general manager still using Mr. Geller's signature stamp when filing TTB reports. J.A. 113 ¶ 8.

TTB informed Gulf Coast via letter that the Company's failure to report the change in stock ownership automatically terminated its alcohol and tobacco permits. J.A. 72–73. The letter also noted Gulf Coast's continued operation without active permits would result in tax liability, along with civil and criminal penalties. *Id.* TTB sent Gulf Coast a second letter over a month later, stating the Company owed $7,836,787.40 in taxes, penalties, and interest for operating without a valid tobacco permit. J.A. 75–76. The agency has yet to initiate tax collection proceedings against Gulf Coast, but Gulf Coast has yet to cease its alcohol and tobacco operations, pay the assessed taxes or penalties, or apply for new alcohol or tobacco permits.

## C.

### Proceedings Below

Gulf Coast filed an APA action in response to TTB's correspondence, along with a request to enjoin the termination of its permits. TTB filed a motion to dismiss which the district court granted while also denying Gulf Coast's injunction request. The district court said the AIA precluded Gulf Coast from attempting to restore its prior tobacco permit;

"challeng[ing] the termination of its permits rather than explicitly challenging the imposition of the excise taxes and fines" did not exempt Gulf Coast from the AIA's bar. *See* J.A. 104. Moreover, the district court recognized Gulf Coast's ability to bring a refund suit and, afterward, submit a new tobacco permit application. J.A. 105. As to Gulf Coast's alcohol permit, the district court held the APA provided it with no jurisdiction to review the permit's automatic termination. J.A. 107–08. If Gulf Coast desired judicial review, the Company would first have to apply for a new alcohol permit under the applicable statute. *See id.* Gulf Coast appealed here, objecting as to the AIA's application and contesting the district court's lack of jurisdiction over the terminated alcohol permit. The Company did not, however, appeal the district court's denial of its motion for injunctive relief.

## II.

As the district court dismissed Gulf Coast's claims based on a lack of subject-matter jurisdiction, *see* FED. R. CIV. P. 12(b)(1), we review the district court's legal conclusions *de novo*. A motion to dismiss the complaint requires us to take as true all well-pled factual allegations within Gulf Coast's complaint—while it also obligates us to disregard any legal conclusions, legal contentions couched as factual allegations, and unsupported factual allegations within the complaint. *See, e.g.*, *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015). Moreover, the court "may consider materials outside the pleadings in deciding whether to grant a motion to dismiss for lack of jurisdiction." *Jerome Stevens Pharms., Inc. v. FDA*, 402 F.3d 1249, 1253 (D.C. Cir. 2005); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 568 n.13 (2007) (stating courts may "take notice of the full contents" of published documents "referenced in the complaint" (citing FED. R. EVID. 201)).

**III.**

Pursuant to the AIA, "[n]o suit for the purpose of restraining the assessment or collection of any tax [can be brought] in any court by any person." 26 U.S.C. § 7421(a). By prohibiting challenges to tax-related laws before those laws are enforced, the AIA "protects the Government's ability to collect a consistent stream of revenue." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 543 (2012). A tax-related law can be challenged, only after the law is enforced, via a refund lawsuit. *See id.* Determining whether the AIA bars a tax-related lawsuit "requires a careful inquiry into the remedy sought, the statutory basis for that remedy, and any implication the remedy may have on [tax] assessment and collection." *Z St. v. Koskinen*, 791 F.3d 24, 29 (D.C. Cir. 2015).

Here, Gulf Coast contends the AIA is inapplicable because the remedy it seeks does not impede tax collection. Gulf Coast wants its terminated tobacco permit restored—an action that would obviate TTB's assertion of unpaid tobacco excise taxes. The Company's argument presupposes its tobacco permit was revoked, not automatically terminated, and Gulf Coast did not receive a certain due process. But the Company's presuppositions do not describe what actually happened; "the statutory basis for [the] remedy" Gulf Coast seeks is inapplicable. *See id.*

Gulf Coast's theory of relief discards the difference between revocations and automatic terminations. Indeed, the Company's briefs use those terms interchangeably. *See, e.g.*, Gulf Coast Opening Br. 5 (stating, at the start of the page's first full paragraph, TTB "declar[ed] the permits *revoked*," only to say at the start of the next full paragraph that "TTB referenced its allegation that Gulf Coast's export warehouse proprietor's

permit *terminated* . . . ." (emphasis added)). Yet the applicable statutes and regulations, as well as Gulf Coast's own tobacco permit, treat "automatic termination" and "revocation" distinctly. This is not surprising—the two concepts are not the same. *Compare* GARNER'S DICTIONARY OF LEGAL USAGE 344 (3d ed. 2011) ("If [a contract] ends because it's cut short . . . by a party's act, it's definitely called a *termination*."), *with id.* at 786 ("*Revoke* = to annul by taking back"). The conceptual difference fits the procedural distinction. Requiring notice and an opportunity for a hearing before *TTB determines* one's permit may be withheld (*i.e.*, before it is revoked) makes sense. Logically, however, to insist on that same process when *a party's action* already extinguished its right to the permit (*i.e.*, the permit automatically terminated) is a *non sequitur*.

Even if there were some basis to treat the automatic termination of Gulf Coast's tobacco permit like a revocation, restoring Gulf Coast's terminated permit has a direct effect on the assessment and collection of taxes. As the Government rightly put it, by "seek[ing] to retroactively restore its tobacco permit[]," "Gulf Coast seeks to . . . avoid[] past, present, and future tax liability." Gov't Br. 28. If Gulf Coast's tobacco permit should never have been revoked in the first instance, either because there was no change in ownership or because Gulf Coast's permit was improperly "revoked," Gulf Coast was, properly, always tax-exempt. Restoring Gulf Coast's old permit, as opposed to the Company applying for a new permit, voids *ab initio* any unpaid excise taxes on tobacco sales made during the period where Gulf Coast operated under its terminated permit.

When the remedy sought directly affects tax collection, the suit is barred by the AIA. *See, e.g.*, *Fla. Bankers Ass'n v. U.S. Dep't of Treasury*, 799 F.3d 1065, 1070–71 (D.C. Cir. 2015)

(stating, when "the obvious purpose of [the] suit[] was to reduce the payment of taxes," the suit would violate the AIA). The "obvious purpose" of imposing the statutory revocation process on automatic terminations is to restore Gulf Coast's prior permit, absolving it of tax liability. This "obvious purpose" directly impairs the collection of assessed taxes, barring the suit under the AIA.[1]

Accordingly, the AIA bars Gulf Coast's attempt to restore its prior tobacco permit.

---

[1] Gulf Coast seeks to exempt itself from the AIA by relying on the Supreme Court's decision in *South Carolina v. Regan*, 465 U.S. 367 (1984). *Regan* provides an exception to the AIA's application when a lawsuit challenges a federal tax and the statute "has not provided an alternative remedy" to bringing an action in federal court. *Id.* at 378. Gulf Coast misapprehends *Regan*'s import. First, and most simply, a refund suit challenging TTB's change-in-ownership finding *is* an "alternative remedy." As Gulf Coast's liability for these assessed taxes "hinges on precisely the same legal issue as does its eligibility for [tax-exempt]" status under its tobacco permit, a refund suit would necessarily resolve the same issues presented here. *See Alexander*, 416 U.S. at 762. Second, restoration of a prior permit is unavailable *altogether* in the automatic termination process; Gulf Coast's tax status, unlike South Carolina's in *Regan*, is not why such relief is unavailable. *Cf. Regan*, 465 U.S. at 380. Finally, if an automatic termination can result in a restored permit after judicial review, then an "automatic termination" is neither automatic nor a termination. Gulf Coast effectively asks us to excise automatic termination from the regulatory scheme, in the name of excusing Gulf Coast from tax liability. Nothing in *Regan* allows us to rewrite a regulation.

**IV.**

As with its tobacco-permit claim, Gulf Coast contends the APA affords it a right to notice and an opportunity to be heard before its alcohol permits may be revoked and insists that it may bring a claim challenging that revocation in district court. *See* Appellant's Reply Br. 2 ("TTB revoked these permits without furnishing notice of claimed violations, and without providing an opportunity to demonstrate or achieve compliance with lawful requirements, as required by the APA, 5 U.S.C. § 558(c)."). However, the alcohol-permitting scheme set out in 27 U.S.C. § 204 takes the place of the APA's license-revocation procedures and provides its own process for judicial review. Under Section 204, challenges to orders revoking alcohol permits must be brought in circuit court, not district court. Because Gulf Coast sought a determination that its permits were improperly "revoked," the district court lacked jurisdiction to hear the company's claim.

**i.**

Gulf Coast bases its claim on the APA, which provides that, in general, an agency may suspend or revoke a license only if it provides notice "in writing of the facts or conduct which may warrant the action" and offers an "opportunity to demonstrate or achieve compliance with all lawful requirements." 5 U.S.C. § 558(c)(1)–(2). The company points out that it received no such process before its permits were, in its words, "revoked." Appellant's Br. 1. Gulf Coast further observes that agency decisions to revoke licenses (or permits) are typically subject to APA review. *See, e.g.*, *Atl. Richfield Co. v. United States*, 774 F.2d 1193, 1199 (D.C. Cir. 1985); *Colley v. James*, --- F. Supp. 3d ---, 2017 WL 2080246, at *13 (D.D.C. May 15, 2017). As a result, Gulf Coast argues,

it properly brought suit in district court under the APA, seeking to compel the agency to follow certain procedures before "revoking" the company's permits.

The APA provides for "a broad spectrum of judicial review of agency action," *Bowen v. Massachusetts*, 487 U.S. 879, 903 (1988), but Congress did not intend this "general grant of review . . . to duplicate existing procedures for review of agency action" or "provide additional judicial remedies in situations where . . . Congress has provided special and adequate review procedures," *id.*; *see Ctr. for Biological Diversity v. EPA*, --- F.3d ---, 2017 WL 2818634, at *8 (D.C. Cir. June 30, 2017) ("[W]here a special statutory review procedure exists, it is ordinarily supposed that Congress intended that procedure to be the exclusive means of obtaining judicial review in those cases to which it applies." (alterations and internal quotation marks omitted)). An "alternative remedy is 'adequate' and therefore preclusive of APA review" if there is "'clear and convincing evidence' of 'legislative intent' to create a special, alternative remedy," *Citizens for Responsibility & Ethics in Wash. (CREW) v. U.S. Dep't of Justice*, 846 F.3d 1235, 1244 (D.C. Cir. 2017) (quoting *Garcia v. Vilsack*, 563 F.3d 519, 523 (D.C. Cir. 2009)), such as when Congress "provide[s] . . . an alternative review procedure," *id.* at 1245 (quoting *El Rio Santa Cruz Neighborhood Health Ctr. v. U.S. Dep't of Health & Human Servs.*, 396 F.3d 1265, 1270 (D.C. Cir. 2005)).

Here the Federal Alcohol Administration Act (FAAA) provides an adequate alternative remedy, "bar[ring] APA review." *CREW*, 846 F.3d at 1245. Under the FAAA, the Treasury Department may suspend or revoke a permit "by order . . . after due notice and opportunity for hearing" and must "state the findings which are the basis for the order." 27 U.S.C. § 204(e). Following a suspension or revocation, the

permittee can file an appeal in this court or in the federal court of appeals where its principal place of business is located. *Id.* § 204(h). Section 204 thus provides an "alternative review procedure" for alcohol-permit revocations, which demonstrates Congress's intent to preclude APA review in that context. *CREW*, 846 F.3d at 1245. Because Congress has chosen to channel all alcohol-permit-revocation challenges through the courts of appeals under section 204, Gulf Coast cannot bring a revocation challenge in district court under the APA.

**ii.**

Importantly, Gulf Coast has repeatedly and forcefully made clear that it seeks only to challenge a *revocation* of its alcohol permits by the agency, based on the agency's failure to provide the Company with certain process it was allegedly due. *See, e.g.*, Appellant's Reply Br. 1, 2, 4; Statement of Issues, ECF No. 1652649 (framing its challenge as one "to the revocation, by the [agency], of [the company's] basic alcohol permits"). As we have explained, however, no revocation challenge may be brought in district court.

To be clear, the TTB's letter to Gulf Coast is not a revocation of the Company's alcohol permits. Far from it. As we see it, the letter is a formal notification to Gulf Coast that, in the agency's view, the Company's permits have *automatically terminated* and a warning that the company would be subject to penalties for continuing to operate. Thus, contrary to what the concurrence suggests, we in no way believe that this Court has jurisdiction under Section 204 over Gulf Coast's claim that its permits were somehow "revoked."

However, Gulf Coast's argument to us for why the district court had jurisdiction is that its permits were revoked and that

procedurally defective permit revocations can be challenged in district court. Because procedurally defective permit revocations *cannot* be challenged in district court, and because Gulf Coast has given us no other reason to reverse the district court, we deny the Company's appeal.[2]

We would be confronted with a different question, however, had Gulf Coast instead argued that it was challenging a determination by the agency that its permits had automatically terminated. *See* 27 C.F.R. § 44.107. In the past, we have found final agency action and allowed parties to bring pre-enforcement challenges under somewhat similar circumstances, but based on reasoning very different from the kind Gulf Coast advances here. For example, in *CSI Aviation Services, Inc. v. U.S. Department of Transportation*, 637 F.3d 408 (D.C. Cir. 2011), we concluded that we could review a letter warning the petitioner that it "ha[d] been acting as an unauthorized indirect air carrier in violation of [49 U.S.C.] section 41101" and that it must cease and desist or face civil penalties. *Id.* at 410. We explained that the letter was reviewable, in part, because it represented the agency's

---

[2] Our concurring colleague is of course correct that the "conclusory label[s]" a party invokes are irrelevant to whether we have subject-matter jurisdiction. Concurring Op. 1. We do *not* hold Gulf Coast's use of the term "revocation" somehow gives this Court jurisdiction over the Company's claim under Section 204. In fact, we *agree* that this Court has no jurisdiction to hear an appeal under Section 204 over anything other than an order "denying an application for, or suspending, revoking, or annulling, a basic permit"—regardless of how the challenger labels it. All we have done here is reject Gulf Coast's argument to us that procedurally defective revocations can proceed through district court under the APA. That is reason enough to reject Gulf Coast's appeal and affirm the district court.

definitive position on the legality of the petitioner's actions and because the letter "imposed an immediate and significant burden" on the petitioner by declaring its operations unlawful, among other reasons. *Id.* at 412. And in *Ciba-Geigy Corp. v. EPA*, 801 F.2d 430 (D.C. Cir. 1986), we concluded that the district court could review a letter warning that if the appellant failed to revise the labels of a pesticide, the EPA would consider that pesticide mislabeled and bring a misbranding action. *Id.* at 433. That letter, we explained, was reviewable because it reflected the agency's definitive position on the lawfulness of the company's conduct and warned that failure to "conform to the new labeling requirement" could subject the company to "civil and criminal penalties." *Id.* at 437.

Here, TTB's letter informed Gulf Coast that

> [A]s a result of the[] unreported changes, per . . . 27 U.S.C. § 204(g) . . . Gulf Coast Maritime Supply, Inc. has been operating without the required permits since September 2013 . . . . Because you lack the required permits, you are not authorized to engage in business as . . . an alcohol beverage wholesaler or importer. *Any continued operation as such subjects you to all applicable* . . . [Federal Alcohol Administration] Act *criminal and civil penalties*.

J.A. 73 (emphasis added).

As in our earlier cases, this letter identifies how the agency understands the law to apply to a particular party (Gulf Coast) and warns the party of legal consequences (civil and criminal penalties) that could follow if the party fails to comply with the agency's view. Although some of the facts surrounding Gulf

Coast's purported ownership change may be in dispute, these cases could be read to suggest that Gulf Coast, had it proceeded differently, might have been able to bring an APA claim in district court to test the agency's determination that an ownership change occurred and that the permits had therefore automatically terminated. Gulf Coast, however, made no such argument before us in response to the government's jurisdictional challenge. And because the issue was not briefed, we do not decide it. *See Tao v. Freeh*, 27 F.3d 635, 641 n.7 (D.C. Cir. 1994).

The extent of Gulf Coast's argument is that the APA allows challenges in district court to allegedly procedurally defective alcohol-permit revocations. That is simply not the case. Because we reject that argument, and because Gulf Coast has forfeited any other argument, we affirm the district court's order finding that it lacked jurisdiction over Gulf Coast's alcohol-permits claim.

## V.

The district court was correct to conclude the AIA bars Gulf Coast's attempt to restore its tobacco permit, and equally correct to conclude Gulf Coast's sidestepping of the statutory scheme provides no jurisdiction over its alcohol permit claim.

*Affirmed*.

BROWN, *Circuit Judge*, concurring in part: While I join in the Court's disposition and in Parts I–III, I write separately as to Part IV. There, the Court's analysis departs from the statutory text to entertain Gulf Coast's legal conclusion that its alcohol permit was *revoked*, not automatically terminated. The Court provides no reason for adopting Gulf Coast's labeling. This is unwarranted, as "we do not assume the truth of legal conclusions, nor do we accept inferences that are unsupported by the facts set out in the complaint." *Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015). Indeed, we are to disregard "labels and conclusions" when evaluating whether a complaint states a claim for relief, *see Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007), not indulge them.[1]

---

[1] To be sure, there is ambiguity over the extent to which the Supreme Court's decisions in *Twombly* and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) apply to FED. R. CIV. P. 12(b) challenges outside Rule 12(b)(6). And here, TTB did not move to dismiss under Rule 12(b)(6); only for lack of subject-matter jurisdiction under Rule 12(b)(1). Nevertheless, any ambiguity is beside the point: *Twombly* and *Iqbal* certainly speak to the pleading standards for stating a claim for relief under Rule 8, and Gulf Coast's "revocation" labeling fails to meet that standard. *Cf. Xia v. Kerry*, 73 F. Supp. 3d 33, 41 (D.D.C. 2014) (acknowledging a court's power to "dismiss[] a complaint *sua sponte* for failure to state a claim"). Under the statutes at issue, whether Gulf Coast's conclusory labeling of "revocation" is true informs whether our subject-matter jurisdiction is *bona fide*. We therefore must heed the limits on sufficient jurisdictional pleading: (1) "we do not assume the truth of legal conclusions," *Arpaio*, 797 F.3d at 19; and (2) courts lack subject-matter jurisdiction when the claim "clearly appears to be immaterial and made solely for the purpose of obtaining jurisdiction or where such a claim is wholly insubstantial and frivolous." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89 (1998). There is no basis to read the TTB letter as a revocation, rather than confirming Gulf Coast's alcohol permit automatically terminated. This leaves only one logical conclusion: Gulf Coast labeled what happened a "revocation" to invoke Article III jurisdiction. Dismissing the Company's claim for lack of jurisdiction is proper.

The Court manifests a misapprehension of pleading standards. Testing the sufficiency of allegations requires more than merely refusing to rest the Court's legal conclusions on the complaint's; legal conclusions within the complaint are to be *disregarded*, with the Court then homing in on the "well-pleaded, nonconclusory factual" "nub of the plaintiff's [claim]," if any. *See, e.g.*, *Iqbal*, 556 U.S. at 680 (explaining the analysis in *Twombly*). Then, the Court is to determine whether plausible legal conclusions are suggested from those facts alone. *See id.* Unfortunately, the Court invokes this step-by-step analysis only insofar as it facilitates its desired ends:

First, far from disregarding the complaint's legal conclusions, the Court deploys Gulf Coast's revocation labeling as *the premise* for analyzing whether the district court had jurisdiction over the Company's alcohol permit claim. By itself, this is impermissible. *See id.*

Second, after the Court concludes the district court lacked jurisdiction because we (and our sister circuits) possess jurisdiction over revocation claims under 27 U.S.C. § 204, the Court (conveniently) drops Gulf Coast's revocation label—lest the Court have to explain why it does not want to deal with Gulf Coast filing an amended complaint here, as the Company requested. *See* Gulf Coast Opening Br. 39 ("If this Court finds that it has exclusive jurisdiction over this matter, we ask that it remand this matter to the district court with modification of the Order so dismissal is not with prejudice and the action may be filed before this Court, or in the consideration of judicial economy, the Court deems the complaint to be filed in this Court."). By all but saying Gulf Coast's revocation pleading is "[f]ar from" plausible, *see* Op. 14, the Court's entire discussion of the extent of our jurisdiction over revocations is

proved a frolic; a cautionary tale in why one should not start on the wrong foot.

Third, the Court claims Gulf Coast could have engaged in a wild-goose chase through the outer reaches of our "final agency action" case law to state an APA claim in district court over the permit's automatic termination. But if Gulf Coast's alcohol permit claim is deficient because the Company sought jurisdiction under the wrong statute or in the wrong court, or simply failed to draw the same liability theories as the Court from plead facts, why is *prejudicial* dismissal not reversible error? Because "[t]he court should freely give leave [to amend a complaint] when justice so requires," FED. R. CIV. P. 15 (a)(2), dismissals *without* prejudice are standard fare. I have no problem affirming the district court's dismissal *with* prejudice because any amendment would be futile. The statutory scheme set forth by Congress establishes a process that precludes Gulf Coast from doing what it did: Refusing to apply for a new permit application, using the signature stamp of its deceased owner to continue operating with an automatically terminated permit, and then coming to an Article III court to ask for the due process afforded to revocations. But the Court is not content with a straightforward, textual analysis. Why are we not giving Gulf Coast the opportunity to test the Court's intriguing theory with an amended complaint? *Cf. City of Dover v. United States EPA*, 40 F. Supp. 3d 1, 5–6 (D.D.C. 2013) ("[B]ecause the Court did suggest an alternative theory based on the facts pled, plaintiffs should have been permitted to test that theory. . . . It was error, then, to dismiss plaintiffs' complaint with prejudice.").

By adopting Gulf Coast's legal conclusion, the Court is led astray from some basic points that 27 U.S.C. § 204 and our precedent establish: (1) This Court and the district court lack jurisdiction over Gulf Coast's alcohol permit claim because

there is no jurisdiction over automatic terminations without the denial of a new permit application; (2) The April 2016 TTB letter is not "final agency action;" and (3) Even if the April 2016 letter could somehow be considered "final agency action," 27 U.S.C. § 204 adequately displaces APA review of automatic terminations.  For these reasons, and for the Court's lack of reasons, I write separately—even as I agree that the district court lacked jurisdiction over Gulf Coast's alcohol permit claim.

## I.

Like its tobacco permit claim, Gulf Coast insists the APA affords it a right to notice and an opportunity to be heard before its alcohol permit may cease operating.  But Gulf Coast's argument is not based in the statutory scheme Congress enacted to regulate alcohol permits.

27 U.S.C. § 204 sets forth the alcohol permitting scheme. The statute provides a certain process due when a permit is "revoked," "suspended," or "annulled" that is not due when events result in an "automatically terminated" permit. *Compare id.* § 204(e) (explicitly requiring "due notice and opportunity for hearing to the permittee" when a permit is subject to "revocation, suspension, and annulment") *with id.* § 204(g) ("A basic permit shall continue in effect until suspended, revoked or annulled as provided herein . . . *except* that . . . if transferred by operation of law or if actual or legal control of the permittee is acquired, directly or indirectly, whether by stock-ownership or in any other manner, by any person, then such permit shall be *automatically terminated . . . .*" (emphasis added)).  Section 204(g) goes on to explain, similar to the tobacco permit scheme, that an automatically terminated permit may be succeeded by a timely-filed application for a new permit.  *See id.*  There is no such

proviso within § 204(e) if a permit is revoked, suspended, or annulled. This distinction informs the meaning of § 204(h)'s discussion of judicial review.

Section 204(h) does not mention appeals from an automatic termination, but it does mention appeals "from any order of the Secretary of the Treasury denying an application for . . . a basic permit." *Id.* § 204(h). The section similarly authorizes appeals in response to a permit's suspension, revocation, or annulment. *See id.* With suspensions, revocations, and annulments being explicitly cross-referenced, the natural reading of § 204(h)'s reference to "denying an application for . . . a basic permit" encompasses the denial of a new permit application filed in response to an automatically terminated permit. The upshot of this reading is that, like in the tobacco permitting scheme, revocation and automatic termination are not the same. Nevertheless, Gulf Coast persists in claiming its entitlement to § 204's revocation process when its alcohol permit automatically terminated.

## II.

Gulf Coast claims a letter from TTB establishes that its permit was revoked. As mentioned above, in April of 2016, TTB wrote Gulf Coast, stating "[i]nformation recently received by [TTB] provide[d] the agency with reason to believe that" Gulf Coast was operating without valid permits. JA 72. The letter informed Gulf Coast that "such activities violate federal law," and "[c]ontinued operation without the required permits[] subjects you to criminal penalties and potential civil liability." *Id.* It then goes on to note Gulf Coast's unreported change in ownership—characterizing that ownership change as satisfying the "automatic termination" definitions within the alcohol and tobacco permitting schemes—and concludes, "*as a result of these unreported changes*, per . . . 27 U.S.C. § 204(g) . . . [Gulf

Coast] has been operating without the required permits since September 2013." JA 73 (emphasis added). As to Gulf Coast's alcohol permit, revocation is neither mentioned nor alluded to, and the statutory process afforded to revocations (under either the alcohol permitting statute or the APA) is not cited. But to Gulf Coast, this correspondence was a "letter decision" that its alcohol permit retroactively terminated—by which the Company means, "revoked"—making the letter "final agency action" subject to judicial review under the APA. *See, e.g.*, Gulf Coast Opening Br. 29.

Section 204 renders the denial of a new permit application—an application made in response to an automatically terminated permit—final agency action subject to judicial review. *See* 27 U.S.C. § 204(h) (stating the mere application for a new permit allows "the outstanding basic permit [to] continue in effect until such application is finally acted on by the Secretary of the Treasury," and if that "final[] act[ion]" is denial, judicial review may ensue in a circuit court of appeals). Gulf Coast did not avail itself of this process; short-circuiting the statute's course by skipping over the new permit application. Doing so left the Company without the statutorily specified "final agency action" that would trigger judicial review, either under the alcohol permit statute or the APA. *See, e.g.*, *Reliable Automatic Sprinkler Co. v. Consumer Prods. Safety Comm'n*, 324 F.3d 726, 731 (D.C. Cir. 2003); *see also* 5 U.S.C. § 704. The letter is not a stand-in for Gulf Coast's end-run around § 204(h).

Deeming the April 2016 letter "final agency action" would be an unjustifiable expansion of the APA's scope. The letter's content and purpose are merely advisory; it reminds Gulf Coast of the consequences of operating with a terminated permit and without a new permit application. Informing Gulf Coast of extant facts does not "impose[] an obligation, den[y] a right, or

fix[] some legal relationship." *See, e.g.*, *Reliable Automatic Sprinkler*, 324 F.3d at 731 (discussing what constitutes "final agency action" under the APA). The letter is reasonably read as indicating when the statutory trigger automatically terminating Gulf Coast's alcohol permit occurred—upon *the company's* failure to timely report an ownership change. But "final agency action" rests on *the agency* consummating its decision-making process. *See Bennett v. Spear*, 520 U.S. 154, 177–78 (1997). Moreover, the legal consequences (civil and criminal penalties) identified within the TTB letter are clearly understood to reference the consequences of operating without a valid alcohol permit, not the consequences of refusing to comply with the letter. This also disqualifies the letter from constituting "final agency action." *Cf. id.* Reading the letter in line with Gulf Coast's legal theory, as the Court does, impermissibly "accept[s] inferences that are unsupported by the facts." *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015).

## III.

As both the Supreme Court and this Court recognize, the APA is not to "duplicate existing procedures for review of agency action" or "provide for additional judicial remedies in situations where Congress has provided special and adequate review procedures." *Bowen v. Massachusetts*, 487 U.S. 879, 903 (1988); *Citizens for Responsibility and Ethics in Washington v. U.S. Dep't of Justice*, 846 F.3d 1234, 1244 (D.C. Cir. 2017). An "adequate" remedy "need not provide relief identical to relief under the APA," *Garcia v. Vilsack*, 563 F.3d 519, 522 (D.C. Cir. 2009)—it can, in fact, be less generous than APA relief, *see id.* (stating a remedy is not "adequate" when that remedy itself "offers only doubtful and limited relief"); *see also Council of & for the Blind of Del. Cnty. Valley, Inc. v. Regan*, 709 F.2d 1521, 1532–33 (D.C. Cir. 1983) (explaining

that the alternative review need not be "more effective" than APA review). Accordingly, even if one were to consider the letter TTB issued "final agency action"—rather than merely advising Gulf Coast of extant facts and the consequences of operating without a permit—§ 204 displaces judicial review under the APA.

The new permit application process allowed for Gulf Coast to seek judicial review of the alcohol permit's automatic termination. Upon the transfer of Mr. Geller's stock, Gulf Coast could have filed an application for a new permit with TTB while citing no change in ownership. TTB, independently verifying the ownership assertion in the application and being aware of Mr. Geller's death and corresponding stock transfer, might have denied the new permit application. If so, § 204(h) would have allowed Gulf Coast to appeal that denial to a circuit court, where Gulf Coast could contest whether an ownership change occurred. During the new permit application process, Gulf Coast could have continued operating under its prior alcohol permit without risking any penalty. Had the Company then appealed the new permit denial, § 204(h) would have stayed TTB's decision— preserving Gulf Coast's old permit, and thus continuing to immunize it from penalties.

To be sure, § 204 required Gulf Coast to do what it claims it did not have to do—file an application for a new permit. But even then, as explained above, *Gulf Coast was under no obligation to cite any ownership change*; TTB bore the burden of establishing whether Gulf Coast's assertion of ownership was *bona fide* before approving a new permit application. Section 204 therefore gave Gulf Coast the opportunity to contest any TTB assertion of an ownership change; the "same genre" of relief the Company asks for under the APA here, placing § 204 within the realm of "adequate" APA

displacement.  *See El Rio Santa Cruz Neighborhood Health Ctr. V. U.S. Dep't of Health & Human Servs.*, 396 F.3d 1265, 1271 (D.C. Cir. 2005).  The additional paperwork may seem cumbersome, but it is also *de-minimis* when compared to the risk Gulf Coast took in not filing anything at all after the stock transfer.  In any event, an adequate alternative to APA review need not be "more effective" or more equitable than APA review.  *See Council of & for the Blind of Del. Cnty. Valley*, 709 F.2d at 1532–33; *cf. Fornaro v. James*, 416 F.3d 63, 69 (D.C. Cir. 2005) ("Yet however unsatisfactory the CSRA's approach may appear to the plaintiffs, the fact that a remedial scheme chosen by Congress vindicates rights less efficiently than a collective action does not render the CSRA remedies inadequate for purposes of mandamus.").  Here, the alcohol permitting statute afforded Gulf Coast an adequate opportunity to seek judicial review of its ownership status.  That Gulf Coast chose—and it was a choice—to not take advantage of the process Congress articulated does not make the process inadequate.  *Cf. Women's Equity Action League v. Cavazos*, 906 F.2d 742, 751 (D.C. Cir. 1990) ("Plaintiffs urge, however, that individual actions against discriminators cannot redress the systemic lags and lapses by federal monitors about which they complain. . . . But under our precedent, situation-specific litigation affords an adequate, even if imperfect, remedy.").

I agree with my colleagues that the district court lacked jurisdiction over Gulf Coast's alcohol permit claim.  But I do not agree with their intriguing theories for bending pleading standards, the statute Congress enacted, and our precedent on "final agency action."  We should affirm the judgment of the district court because neither it—nor we—possess jurisdiction over Gulf Coast's alcohol permit claim.