# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued November 8, 2018        Decided June 25, 2019

No. 18-1028

VALERO ENERGY CORPORATION,
PETITIONER

v.

ENVIRONMENTAL PROTECTION AGENCY,
RESPONDENT

———

On Petition for Review of an Action of the
United States Environmental Protection Agency

———

*Samara L. Kline* argued the cause for petitioner. On the briefs were *Clara Poffenberger*, *Lisa M. Jaeger*, *Brittany M. Pemberton*, *Warren W. Harris*, *Yvonne Y. Ho*, and *Christopher L. Dodson*. *Megan H. Berge*, *Vincent M. Wagner*, and *Evan A. Young* entered appearances.

*Benjamin R. Carlisle*, Attorney, U.S. Department of Justice, argued the cause for respondent. With him on the brief were *Jeffrey H. Wood*, Acting Assistant Attorney General, and *Jonathan D. Brightbill*, Deputy Assistant Attorney General.

Before: HENDERSON, ROGERS, and SRINIVASAN, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* SRINIVASAN.

SRINIVASAN, *Circuit Judge*: The Energy Independence and Security Act of 2007 contains a citation to nowhere. The Act requires gasoline sold in the United States to include a certain amount of renewable fuel, and tasks the Environmental Protection Agency with conducting periodic reviews to enable appropriate adjustments to the renewable-fuel requirements. In setting out EPA's periodic-review obligation, the statute directs the agency to examine certain requirements ostensibly set out in a referenced provision of the Clean Air Act. The cited provision, though, does not exist.

In an effort to make sense out of nonsense, EPA issued a document setting forth its interpretation of the periodic-review provision and explaining why it believes it has complied. Valero Energy Corporation, a petroleum refiner, took issue with EPA's position in the document and filed a petition for review in this court. We conclude that the EPA document does not constitute final agency action. We therefore dismiss Valero's petition for lack of jurisdiction.

I.

A.

In 2005 and 2007, Congress amended the Clean Air Act to establish the Renewable Fuel Standards program. *See* Energy Policy Act of 2005, Pub. L. No. 109-58, 119 Stat. 594; Energy Independence and Security Act of 2007, Pub. L. No. 110-140, 121 Stat. 1492. Congress aimed to "move the United States toward greater energy independence and security" and to "increase the production of clean renewable fuels." 121 Stat. at 1492. The program charges EPA with requiring "that gasoline sold . . . in the United States . . . contain[] [a minimum] volume of renewable fuel." 42 U.S.C. § 7545(o)(2)(A)(i). The statute defines renewable fuel to mean fuel "produced from renewable biomass." *Id.* § 7545(o)(1)(J).

To ensure that gasoline sold in the United States meets those standards, EPA requires refiners (and importers) of gasoline to include a minimum amount of renewable fuel in their gasoline. The required annual volumes for each renewable fuel are prescribed in statutory tables. *See id.* § 7545(o)(2)(B). For years not covered by the tables, the statute calls for EPA to set the required volumes "based on a review of the implementation of the program . . . and an analysis of [six factors]." *Id.* § 7545(o)(2)(B)(ii).

In addition, the statute directs EPA to conduct "periodic reviews" of the program "[t]o allow for the appropriate adjustment" of the minimum total volumes for each renewable fuel. *Id.* § 7545(o)(11). Specifically, EPA must periodically review "existing technologies," "the feasibility of achieving compliance with the requirements," and "the impacts of the requirements *described in subsection (a)(2)* on each individual and entity described in paragraph (2)." *Id.* (emphasis added) (footnote omitted). The highlighted reference, however, is an error:  there is no "subsection (a)(2)."

## B.

In November 2017, EPA published a document entitled "Periodic Reviews for the Renewable Fuel Standard Program." The first of the document's two parts addresses the agency's obligations under the periodic-review provision, § 7545(o)(11), including the provision's reference to the nonexistent "subsection (a)(2)." *See* Periodic Review Document at 3–7, J.A. 5–9. With regard to the intended meaning of that erroneous reference, EPA opines that there is "no 'overwhelming evidence from the structure, language, and subject matter' of the statute pointing in a single direction." *Id.* at 4, J.A. 6 (quoting *U.S. Nat'l Bank v. Indep. Ins. Agents of Am.*, 508 U.S. 439, 462 (1993)). As a result, EPA concludes,

the reference to "subsection (a)(2)" renders the provision "unintelligible" and thus partially "inoperative." *Id.* at 3–5, J.A. 5–7.

In the alternative, EPA sets forth its best attempt to give content to § 7545(o)(11)'s mistaken cross-reference. Because the reference to "subsection (a)(2)" is ambiguous, EPA reasons, it can adopt "any reasonable construction." *Id.* at 6, J.A. 8. EPA concludes that, if necessary, it would read "subsection (a)(2)" to refer to subsection (o)(2)(B)—i.e., § 7545(o)(2)(B). *See id.* at 5–7, J.A. 7–9. EPA would also interpret the ensuing reference to "each individual and entity described in paragraph (2)" to refer to the list of regulated individuals and entities in § 7545(o)(2)—namely, "refineries, blenders, distributors, and importers" and "consumers of transportation fuel." *Id.* at 6–7, J.A. 8–9 (citations omitted). In sum, EPA would interpret the provision to require periodic review of the impacts of the required annual volumes contained in § 7545(o)(2)(B) on "refineries, blenders, distributors, and importers, as well as on consumers of transportation fuel." *Id.* at 7, J.A. 9.

In the second part of the document, EPA explains why, under either interpretation of the erroneous cross-reference, its prior actions have fulfilled its statutory obligation to conduct periodic reviews. *See id.* at 8–12, J.A. 10–14. As evidence that it has conducted the required reviews, EPA points to various analyses it has performed for rulemakings relating to the Renewable Fuel Standard program and for other occasions. *See id.*, J.A. 10–14. The document marks the first time those analyses have been explicitly identified as "periodic reviews." *See id.* at 8, J.A. 10. Nonetheless, EPA concludes that they suffice to establish compliance with the requirements of § 7545(o)(11). That said, a footnote states that "neither [the] interpretation of the statute nor the description of [EPA's]

studies in this document require any party or the agency to do (or not do) anything beyond what the statute requires." *Id.* at 2 n.1, J.A. 4 n.1. The footnote also states: "[O]ur reviews of the [Renewable Fuel Standard] program occur on a continuing basis, and are subject to change in both approach and results. Indeed, we regularly consider new approaches and update our [Renewable Fuel Standard] technical analysis, and we intend to continue doing so." *Id.*

## C.

In January 2017, ten months before publication of the EPA document, petitioner Valero Energy Corporation sued EPA in the Northern District of Texas. Among other claims, Valero contended that § 7545(o)(11) imposes a mandatory duty to conduct periodic reviews and that EPA had failed to conduct even a single review. *See Valero Energy Corp. v. EPA*, No. 7:17-cv-00004-O, 2017 WL 8780888, at *5 (N.D. Tex. Nov. 28, 2017). Valero sought an order compelling EPA to conduct periodic reviews. *Id.* The district court dismissed Valero's claim, concluding that the statute "does not clearly mandate a date certain on which [EPA is] required to conduct [§ 7545(o)(11)] periodic reviews." *Id.*

Soon after the district court's decision, EPA published the document at issue in this case. Valero filed a timely petition for review of the document in this court. According to Valero, EPA's document incorrectly interprets the periodic-review provision and erroneously concludes that the agency has complied with its periodic-review obligations.

## II.

We start (and end) with the question of finality. The Clean Air Act authorizes review only of "final action," 42 U.S.C. § 7607(b)(1), a term synonymous with "final agency action"

under the APA, *see Sierra Club v. EPA*, 873 F.3d 946, 951 (D.C. Cir. 2017). Under the Clean Air Act, the requirement of finality is jurisdictional. *See, e.g.*, *Portland Cement Ass'n v. EPA*, 665 F.3d 177, 193 (D.C. Cir. 2011) (per curiam). We therefore must address at the outset whether the EPA document is sufficiently final to support our jurisdiction. We conclude that the document does not constitute "final action," § 7607(b)(1), and we thus have no occasion to reach the merits of Valero's petition.

An agency action is final "if two independent conditions are met: (1) the action marks the consummation of the agency's decisionmaking process and is not of a merely tentative or interlocutory nature; and (2) it is an action by which rights or obligations have been determined, or from which legal consequences will flow." *Soundboard Ass'n v. FTC*, 888 F.3d 1261, 1267 (D.C. Cir. 2018) (formatting modified) (quoting *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997)). Because "*both* prongs of *Bennett v. Spear* must be satisfied independently," *id.* at 1271, the failure to satisfy either prong means that the challenged action is nonfinal. Here, EPA's document does not meet *Bennett*'s second prong.

That prong looks to the "actual legal effect (or lack thereof) of the agency action in question on regulated entities." *Nat'l Mining Ass'n v. McCarthy*, 758 F.3d 243, 252 (D.C. Cir. 2014). EPA's document has no legal consequences for any regulated party. The document imposes no obligations, prohibitions, or restrictions; it "compels action by neither the recipient nor the agency." *Holistic Candlers & Consumers Ass'n v. FDA*, 664 F.3d 940, 944 (D.C. Cir. 2012). Nor does it affect EPA's legal obligation to conduct periodic reviews. Rather, it leaves the world just as it found it. *See Indep. Equip. Dealers Ass'n v. EPA*, 372 F.3d 420, 428 (D.C. Cir. 2004). For instance, the document does not expose any regulated party to

the possibility of an enforcement action or to enhanced fines or penalties. *See Sackett v. EPA*, 566 U.S. 120, 126 (2012). The document instead only presents EPA's position on what the law is and whether it has complied. Absent some identifiable effect on the regulated community, an agency works no legal effect "merely by expressing its view of the law." *AT&T Co. v. EEOC*, 270 F.3d 973, 976 (D.C. Cir. 2001).

The agency's own characterization of its action is to the same effect. *See Nat'l Mining Ass'n*, 758 F.3d at 252. EPA expressly disclaims any legal effect. The document states that it does not "require any party or the agency to do (or not do) anything beyond what the statute requires." Periodic Review Document at 2 n.1, J.A. 4 n.1. And the document makes clear that it has no binding effect on how EPA will conduct future reviews. *See id.* While disclaimers of that sort can carry little weight when they are "boilerplate," *Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1023 (D.C. Cir. 2000), we have taken cognizance of such language when—as here—the rest of "the document is [similarly] devoid of relevant commands" to regulated parties. *Nat'l Mining Ass'n*, 758 F.3d at 253; *see also Gen. Elec. Co. v. EPA*, 290 F.3d 377, 383 (D.C. Cir. 2002).

On its own terms, then, the EPA document "do[es] not purport to carry the force of law." *Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.*, 452 F.3d 798, 808 (D.C. Cir. 2006). The EPA accordingly acknowledged at oral argument that the document has "no legal effect." Oral Argument at 35:47–35:48. It "has force only to the extent the agency can persuade a court to the same conclusion," *AT&T Co.*, 270 F.3d at 976, which weighs against finding that it qualifies as final action.

That is dispositive under certain of our precedents, which instruct that the analysis under *Bennett*'s second prong focuses

solely on the agency action's *legal* consequences. *See Joshi v. Nat'l Transp. Safety Bd.*, 791 F.3d 8, 11–12 (D.C. Cir. 2015). In other decisions, though, we have indicated that the finality analysis can look to whether the agency action has a *practical* effect on regulated parties, even if it has no formal legal force. *E.g.*, *CSI Aviation Servs., Inc. v. U.S. Dep't of Transp.*, 637 F.3d 408, 412 (D.C. Cir. 2011) (concluding that agency action was final because it "imposed an immediate and significant practical burden"); *Nat'l Ass'n of Home Builders v. Norton*, 415 F.3d 8, 15 (D.C. Cir. 2005) ("Finality resulting from the practical effect of an ostensibly non-binding agency proclamation is a concept we have recognized in the past."); *cf. U.S. Army Corps of Eng'rs v. Hawkes Co.*, 136 S. Ct. 1807, 1815 (2016) (endorsing a "pragmatic approach . . . to finality" (internal quotation marks omitted)).

We need not explore the potential tension between those lines of decisions because the EPA document is nonfinal even if we take into account its practical consequences. The document does not impose an "immediate and significant practical burden on" regulated parties like Valero. *CSI Aviation Servs.*, 637 F.3d at 412. It does not, for example, put Valero to the "painful choice between costly compliance and the risk of prosecution at an uncertain point in the future." *Id.* Nor does it impose obligations by chicanery—disclaiming legal force and effect but nonetheless "read[ing] like a ukase." *Appalachian Power*, 208 F.3d at 1023. In short, the EPA document is nonfinal and therefore unreviewable.

Valero sees things differently. It first contends that the document "alter[s] the legal regime," *NRDC v. EPA*, 643 F.3d 311, 320 (D.C. Cir. 2011), because it "ascrib[es] new meaning to clear statutory terms," Valero Reply Br. 6. We have never held that legal novelty alone establishes finality. In *NRDC*, we decided that a guidance document amounted to final agency

action, not because it presented a novel interpretation of the Clean Air Act, but because it purported to "bind[] EPA regional directors" to that interpretation, resulting in legal consequences for states submitting implementation plans. *NRDC*, 643 F.3d at 320. Here, by contrast, the document binds no one and results in no discernible legal consequences.

Valero contends that legal consequences necessarily flow from the document's conclusion that EPA has complied with § 7454(o)(11). In support of that view, Valero leans heavily on *Sierra Club v. EPA*, 699 F.3d 530 (D.C. Cir. 2012), in which we concluded that an EPA notice was final because it "declared, for the first time, that [EPA] ha[d] fully accomplished the [duties] required by § 112(c)(6)" of the Clean Air Act. *Id.* at 534. But in *Sierra Club*, unlike this case, EPA's notice had legal force and effect.

Sierra Club had originally sued EPA to compel the promulgation of emissions standards for certain hazardous air pollutants, as required by § 112(c)(6) of the Clean Air Act. *See id.* at 532. EPA sought dismissal of that complaint, pledging that, after it fully complied with its statutory obligation, "it intended . . . to issue a notice that explains how it has satisfied" the Act. *Id.* (internal quotation marks omitted). The district court "accepted EPA's view" and dismissed the complaint. *Id.* EPA subsequently promulgated the promised notice, which declared that EPA was in compliance with the Act, and which, crucially, "bar[red] further demands for additional source-listing or standard-setting." *Id.* at 535. We held that the EPA notice was final because it "purport[ed] to close off any legal claim that [EPA] ha[d] fallen short of compliance with [the Act]." *Id.* at 534.

Valero asserts that the EPA document in this case likewise "forecloses interested parties from arguing that EPA has failed

to conduct periodic reviews": "Courts can no longer compel EPA to conduct periodic reviews because the [document] proclaims that EPA *has* been doing those reviews all along." Valero Reply Br. 8–9. The document, though, does no such thing. It has no effect whatsoever on Valero's ability to sue to compel EPA to conduct periodic reviews. *See* 42 U.S.C. § 7604(a)(2) (authorizing suit "where there is alleged a failure of the Administrator to perform any act or duty . . . which is not discretionary"). EPA itself thus has represented that it "has not and will not argue . . . that the . . . Document 'close[s] off' or has any other legal effect on that claim." EPA Br. 18.

In fact, Valero and another litigant have already brought two such cases, arguing (unsuccessfully) that EPA has failed to comply with its duty under § 7454(o)(11). *See* EPA Motion to Dismiss, *Small Retailers Coal. v. EPA*, No. 7:17-cv-00121-O (N.D. Tex. Feb. 20, 2018); *Valero Energy Corp. v. EPA*, No. 7:17-cv-00004-O, 2017 WL 8780888, at *1 (N.D. Tex. Nov. 28, 2017). Tellingly, the EPA document has had no legal effect on the outcome of either case. *Small Retailers Coalition* was decided after the publication of the document, and the court did not find—and EPA did not argue—that the challenge was categorically foreclosed by the document.

Instead, the EPA document sets forth a legal position without imposing any new obligations, prohibitions, or requirements. As our precedents dictate, such an action fails the second prong of *Bennett v. Spear*'s finality test and is unreviewable. *See, e.g.*, *Nat'l Min. Ass'n*, 758 F.3d at 252; *Holistic Candlers*, 664 F.3d at 944; *Indep. Equip. Dealers Ass'n*, 372 F.3d at 427–28; *AT&T Co.*, 270 F.3d at 975–76.

A contrary conclusion would have the undesirable consequence of discouraging agencies from issuing clarifying documents like this one. EPA published its interpretation of

the statute because it wished to "ma[k]e its views public" "as a matter of good governance and transparency," EPA Br. 15. "Treating such [interpretations] as final and judicially reviewable agency action would discourage their use, 'quickly muzzl[ing] [those] informal communications between agencies and their regulated communities . . . that are vital to the smooth operation of both government and business.'" *Rhea Lana, Inc. v. Dep't of Labor*, 824 F.3d 1023, 1028 (D.C. Cir. 2016) (quoting *Indep. Equip. Dealers Ass'n*, 372 F.3d at 428). Our finality jurisprudence rightly rejects that unwelcome result.

Finally, to the extent Valero believes that any of the periodic reviews identified by the EPA document were themselves arbitrary, capricious, or otherwise contrary to law, we note that Valero could have directly petitioned for review of those actions under 42 U.S.C. § 7607. While such petitions ordinarily need to be filed within sixty days of publication, if a "petition is based solely on grounds arising after such sixtieth day, then any petition for review under this subsection shall be filed within sixty days after such grounds arise." § 7607(b)(1). Here, EPA did not identify any of the prior analyses as "periodic reviews" until it issued its document in November 2017. Valero did not thereafter bring a petition challenging any of the agency's prior analyses.

\* \* \* \* \*

For the foregoing reasons, we dismiss the petition for review.

*So ordered.*