# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued May 11, 2022          Decided August 12, 2022

No. 16-1447

RACING ENTHUSIASTS AND SUPPLIERS COALITION,
PETITIONER

v.

ENVIRONMENTAL PROTECTION AGENCY AND MICHAEL S.
REGAN,
RESPONDENTS

———

On Petition for Review of an Action
of the Environmental Protection Agency

———

*Shannon S. Broome* argued the cause for petitioner. With her on the briefs were *Charles H. Knauss* and *Erin Grisby*.

*Sue Chen*, Trial Attorney, U.S. Department of Justice, argued the cause for respondents. With her on the brief was *Todd Kim*, Assistant Attorney General.

Before: KATSAS and WALKER, *Circuit Judges*, and GINSBURG, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* WALKER.

WALKER, *Circuit Judge*: Amateur race car drivers often compete against each other after modifying ordinary cars to

increase their speed. The Petitioner in this case claims that an EPA rule curtailed the practices of amateur racers and the businesses that make and sell them car parts. But because the Petitioner lacks standing for most of its claims, and because the remaining claim does not challenge a final agency action, we do not have jurisdiction.

I

A

On Thanksgiving Day in 1895, six drivers lined up on a snowy Chicago morning for what is widely regarded as America's first car race. Two finished. The winner drove 54.36 miles in 7 hours and 53 minutes on 3.5 gallons of gas. He went home $5,000 richer.[1]

Today, thousands of Americans continue that amateur-racing tradition. The racers often modify their otherwise ordinary street cars to make them go faster. And retail shops across the country sell them the tools and aftermarket car parts that make those modifications possible.

B

The Clean Air Act prohibits tampering with the emissions systems of a "motor vehicle." 42 U.S.C. § 7522(a)(3)(A). It also prohibits the sale of defeat devices — tools and parts that facilitate such motor vehicle tampering. *Id.* § 7522(a)(3)(B).

---

[1] Keith R. Gill, *Chicago Times-Herald Race of 1895*, Encyclopedia of Chicago, http://www.encyclopedia.chicagohistory.org/pages /2380.html.

That raises the question: What is a "motor vehicle"? The relevant statutory provision defines it as a "self-propelled vehicle designed for transporting persons or property on a street or highway." *Id.* § 7550(2). Vehicles built by manufacturers as race cars — think of cars built for the Indy 500 — are not considered motor vehicles because they are not "designed for transporting persons or property on a street or highway." *Id.*

C

For decades, many amateur racers have believed that the Clean Air Act permits them to modify the emissions systems of ordinary cars they convert into race cars. According to them, the converted cars are no longer designed for highway use and thus are not "motor vehicles."

But in 2015, the Environmental Protection Agency proposed a rule with language to the contrary. *NPRM, Greenhouse Gas Emissions and Fuel Efficiency Standards for Medium- and Heavy-Duty Engines and Vehicles—Phase 2*, 80 Fed. Reg. 40,138 (July 13, 2015). It said that "there is no exemption from the tampering and defeat-device prohibitions that would allow for converting [an] engine or vehicle for competition use." *Id.* at 40,527. It added that "it is not permissible to remove a motor vehicle or motor vehicle engine from its certified configuration regardless of the purpose for doing so." *Id.*

Commenters objected to the proposed language, and in 2016, the EPA retreated. It excluded that language from its final rule. It explained — as an aside in the final rule's preamble — that the "proposed language was not intended to represent a change in the law or in EPA's policies or practices towards dedicated competition vehicles." *Greenhouse Gas*

*Emissions and Fuel Efficiency Standards for Medium- and Heavy-Duty Engines and Vehicles—Phase 2*, 81 Fed. Reg. 73,478, 73,957 (Oct. 25, 2016).

In the same 2016 rule, the EPA promulgated several cosmetic amendments regarding an exemption from certain regulatory requirements for nonroad engines and equipment (like snowmobiles and tractors). *Greenhouse Gas Emissions*, 81 Fed. Reg. at 73,972, 74,034, 74,104, 74,217, 74,223, 74,227; 40 C.F.R. § 1068.235(b). It also updated the regulatory definition of motor vehicle. Under the new definition, even if an individual removes certain safety features from a motor vehicle, it remains a motor vehicle unless "absence of [those safety features] would prevent operation on highways.". *Greenhouse Gas Emissions*, 81 Fed. Reg. at 73,972; 40 C.F.R. § 85.1703(b).

The Racing Enthusiasts and Suppliers Coalition, an association that represents businesses that make and sell aftermarket car products, now petitions for review. 42 U.S.C. § 7607(b)(1).

II

The Coalition challenges nine parts of the EPA's 2016 rule. Those nine parts fall into three categories: (1) seven cosmetic amendments regarding the competition exemption for nonroad engines and equipment; (2) the update to the regulatory definition of motor vehicle; and (3) the aside in the rule's preamble.

We have no jurisdiction to consider those challenges: The Coalition lacks standing to challenge the cosmetic amendments; it also lacks standing to challenge the revised

definition of motor vehicle; and the preamble's aside is not a challengeable final agency action.

## A

The "irreducible constitutional minimum of standing contains three elements." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). A petitioner must suffer "an injury in fact" that is "fairly traceable to the challenged action of the defendant" and that "a favorable decision" will likely redress. *Id.* at 560-61 (cleaned up). To meet that standard when seeking our direct review of agency action, a petitioner must point to "evidence sufficient to support its standing." *Utility Workers Union of America Local 464 v. FERC*, 896 F.3d 573, 578 (D.C. Cir. 2018) (quoting *Sierra Club v. EPA*, 292 F.3d 895, 899 (D.C. Cir. 2002)).

## 1

The Coalition lacks standing to challenge the EPA's seven cosmetic amendments regarding the competition exemption for nonroad engines and equipment like snowmobiles and tractors.

Before the 2016 rule, the competition exemption said, "If you modify any nonroad engines/equipment after they have been placed into service in the United States so they will be used solely for competition, they are exempt without request" from certain Clean Air Act requirements. 40 C.F.R. § 1068.235(b) (2011).

In the 2016 rule, the EPA made seven amendments to the Code of Federal Regulations to reiterate that the competition exemption applies only to "nonroad engines/equipment," not to motor vehicles. *Greenhouse Gas Emissions and Fuel Efficiency Standards for Medium- and Heavy-Duty Engines*

*and Vehicles—Phase 2*, 81 Fed. Reg. 73,478, 73,972, 74,034, 74,104, 74,217, 74,223, 74,227 (Oct. 25, 2016). For example, the EPA added an introduction to § 1068.235 that says, "The following provisions apply for nonroad engines/equipment, but not for motor vehicles or for stationary applications." *Id.* at 74,227.

Because those amendments were merely cosmetic, they had no effect on the rights and responsibilities of the Coalition's members. Before 2016, the competition exemption applied only to "nonroad engines/equipment." After the 2016 clarifications, it *still* applied only to "nonroad engines/equipment." So the Coalition's members can continue to rely on the previous scope of that exemption — if indeed they ever relied on it, which the Coalition has failed to demonstrate.

2

The Coalition also has not shown that it has standing to challenge the EPA's update to the regulatory definition of motor vehicle.

Before the 2016 rule, the regulatory definition of motor vehicle expressly excluded any vehicle that "lacks features customarily associated with safe and practical street or highway use." 40 C.F.R. § 85.1703(a)(2) (2010).

In the 2016 rule, the EPA added a new subsection just after that definition. It provides that "in applying the criterion in paragraph (a)(2) of this section, vehicles that are clearly intended for operation on highways are motor vehicles. Absence of a particular safety feature is relevant only when absence of that feature would prevent operation on highways."

*Greenhouse Gas Emissions*, 81 Fed. Reg. at 73,972; 40 C.F.R. § 85.1703(b).

Because that update expands the regulatory definition of motor vehicle, the update could potentially injure *someone*. For example, a group of racers could marshal evidence that they previously removed safety features from their cars to take the cars outside the regulatory definition of motor vehicle, but now they can't. Or an auto-parts seller could point to evidence that it previously sold defeat devices, but now it won't be able to sell them as often because more vehicles fall within the regulatory definition of motor vehicle.

But the Coalition has not offered sufficient evidence of that sort. Instead, it filed a declaration by the CEO of Turn 14 Distribution, "a wholesale automotive parts distributor of a range of vehicle products, including products for niche vehicle markets, such as vehicles used solely for racing." Petitioner's Brief PDF p. 76. That declaration, which has no supporting exhibits, says that the 2016 rule has:

- "called into question the legality of significant aspects of the automotive aftermarket industry and cast a cloud of uncertainty over the recreation activity of building dedicated competition vehicles by hobbyists and enthusiasts";
- "caused an increase in compliance costs for Turn 14"; and
- "adversely impacted Turn 14 Distribution's sales due to the chilling effect the Rule has had on car hobbyists and enthusiasts that build dedicated competition vehicles, diminishing their participation and, as a consequence, their auto part purchases."

*Id.* at 78.

Such "conclusory assertions" are not evidence of standing. *Utility Workers Union*, 896 F.3d at 578. What are the affected "aspects of the automotive aftermarket industry"? What "compliance costs" have increased? Sales of what in particular have been "adversely impacted"? The declaration offers no details about the industry, or what Turn 14 sells, or the harm inflicted on it by a new definition of motor vehicle that encompasses vehicles with fewer safety features. In fact, the phrase "safety features" is nowhere in the declaration. And because we don't know whether Turn 14 sells defeat devices, we don't know the connection between its sales and the EPA's new limit on which vehicles can use defeat devices.

Regardless of whether a different party might have standing to bring this challenge — or whether this Coalition with a different declaration could have had standing — the Coalition has not met its burden to show that its member was injured by the EPA's updated regulatory definition of motor vehicle.

B

"The Clean Air Act authorizes review only of 'final action,' 42 U.S.C. § 7607(b)(1), a term synonymous with 'final agency action' under the APA." *Valero Energy Corp. v. EPA*, 927 F.3d 532, 536 (D.C. Cir. 2019).[2] *Bennett v. Spear* held that a final agency action must (1) "mark the consummation of the agency's decisionmaking process" and (2) "be one by which rights or obligations have been determined, or from which legal

---

[2] That requirement is jurisdictional. *Id.*; *see also Moms Against Mercury v. FDA*, 483 F.3d 824, 828 (D.C. Cir. 2007) ("Petitioners have failed to carry their burden of demonstrating that this Court has subject matter jurisdiction over their claim.").

consequences will flow." 520 U.S. 154, 177-78 (1997) (cleaned up).

To satisfy *Bennett*'s second prong, an agency action must cause "direct and appreciable legal consequences." *U.S. Army Corps of Engineers v. Hawkes Co.*, 578 U.S. 590, 598 (2016) (quoting *Bennett*, 520 U.S. at 178). Determining those consequences is a "pragmatic" inquiry that requires courts to examine the "concrete consequences" of an agency action. *Sierra Club v. EPA*, 955 F.3d 56, 63 (D.C. Cir. 2020). It turns on "the unique constellation of statutes and regulations that govern the action at issue." *California Communities Against Toxics v. EPA*, 934 F.3d 627, 631 (D.C. Cir. 2019); *see also id.* at 637 (the inquiry depends on the concrete legal effect "an agency action has or does not have as a result of the specific statutes and regulations that govern it").

In practice, the consummation of an agency's decision-making process has sufficient concrete consequences when it reads "like a ukase," *Valero*, 927 F.3d at 537 (quoting *Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1023 (D.C. Cir. 2000)), or forces a regulated party to choose between "costly compliance and the risk of prosecution at an uncertain point in the future." *CSI Aviation Services, Inc. v. Department of Transportation*, 637 F.3d 408, 412 (D.C. Cir. 2011).

On the flip side, an agency action does not have sufficient concrete consequences when it imposes "no obligations, prohibitions, or restrictions" on a regulated party. *Sierra Club*, 955 F.3d at 63. That scenario often arises where an agency action has no independent legal force and would not be entitled to deference in future proceedings. *See California Communities*, 934 F.3d at 637-38.

In this case, the aside in the 2016 rule's preamble — which stated that the proposed-but-not-promulgated provisions about tampering with emissions systems were "not intended to represent a change in the law or in EPA's policies or practices towards dedicated competition vehicles" — does not have sufficiently concrete consequences for the Coalition to satisfy *Bennett*'s second prong. *Greenhouse Gas Emissions*, 81 Fed Reg. at 73,957.

For starters, the aside reads less "like a ukase" than like an explanation of an administrative retreat by an agency that *declined* to adopt a rule that *would* have had independent legal force. *Valero*, 927 F.3d at 537 (quoting *Appalachian Power*, 208 F.3d at 1023). As such, "neither EPA nor regulated sources can rely on it as independently authoritative in any proceeding." *California Communities*, 934 F.3d at 638. The Coalition does not dispute that point, nor does either party say that the aside is entitled to deference.

Perhaps that is why the EPA did not cite the preamble's aside as an authority in an enforcement action it brought after issuing the 2016 rule. United States' Response to Amicus Brief at 27-28 n.21, *United States v. Gear Box Z, Inc.*, No. 20-8003 (D. Ariz. March 8, 2021). Instead, the EPA cited the preamble's aside only to show that, despite withdrawing the 2015 proposed rule, it still believes that converted racing vehicles fall within the Clean Air Act's purview. *Id.* That treatment further indicates that the aside has no direct legal consequences. *See Valero*, 927 F.3d at 538.

The Coalition responds that the preamble sets forth a novel interpretation that subjects its members to the risk of penalties. But the Coalition has not proven that the EPA's interpretation is in fact novel. Evidence of the EPA's past approach is mixed, and the aside itself says that the EPA has

not changed its view of what the Clean Air Act means. 81 Fed. Reg. at 73,957 (the abandoned rule "was not intended to represent a change in the law").

To be clear, we are not saying with certainty that the EPA's position is unchanged — only that the Coalition has not shown that it has changed. Nor do we decide whether, with more evidence, the Coalition might have been able to demonstrate that the preamble's aside was final agency action. It has not, however, done so in this case.[3]

\* \* \*

We dismiss the petition for review.

---

[3] There is an additional jurisdictional problem for the Coalition: It has not pointed to any evidence showing that the preamble's aside caused it an injury-in-fact. Its conclusory declaration does not explain with any specificity *how* the preamble's aside has made it choose between "costly compliance and the risk of prosecution at an uncertain point in the future," or *how* it has chilled the practices of its businesses or their customers, or *how* it has otherwise had an identifiable effect on the Coalition. *CSI Aviation*, 637 F.3d at 412. For example, as mentioned above, we do not know from the Coalition's declaration whether any Coalition member even sells the defeat devices prohibited under the understanding of the Clean Air Act to which the preamble's aside refers. *See Utility Workers Union*, 896 F.3d at 578.