# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued April 8, 2022     Decided August 12, 2022

No. 21-1140

CHEVRON U.S.A. INC.,
PETITIONER

v.

ENVIRONMENTAL PROTECTION AGENCY,
RESPONDENT

On Petition for Review of an Action
of the Environmental Protection Agency

*Catherine E. Stetson* argued the cause for petitioner. With her on the briefs were *Ashley C. Parrish, Ilana Saltzbart, Marcella Burke, I. Cason Hewgley IV, Sean Marotta,* and *Danielle Desaulniers Stempel.*

*Andrew R. Varcoe, Stephanie A. Maloney, Thomas A. Lorenzen,* and *Elizabeth B. Dawson* were on the brief for *amicus curiae* the Chamber of Commerce of the United States of America in support of petitioner.

*Phillip R. Dupré*, Attorney, U.S. Department of Justice, argued the cause and filed the brief for respondent.

Before: SRINIVASAN, *Chief Judge*, TATEL* and PILLARD, *Circuit Judges*.

Opinion for the Court filed by *Chief Judge* SRINIVASAN.

SRINIVASAN, *Chief Judge*:  Chevron U.S.A. Inc. intends to decommission two oil platforms located off the coast of California.  The activity of those platforms is generally subject to the Clean Air Act.  Chevron asked the Environmental Protection Agency for guidance on whether, as the process of decommissioning the two oil platforms moves forward, the platforms will cease to qualify as regulated sources under the Clean Air Act.  EPA responded in a letter to Chevron. Unsatisfied with the views set out in EPA's letter, Chevron now seeks judicial review of EPA's response.

We do not reach the merits of Chevron's petition for review.  In the circumstances of this case, the Clean Air Act's venue provision allows for judicial review in this court only if EPA's challenged action is "nationally applicable," as opposed to "locally or regionally applicable."  42 U.S.C. § 7607(b)(1). We conclude that EPA's response letter is locally or regionally applicable, and that venue over Chevron's challenge lies exclusively in the United States Court of Appeals for the Ninth Circuit.  We therefore dismiss Chevron's petition for review.

---

\* Judge Tatel, who assumed senior status after this case was argued and before the date of this opinion, recused himself from the case after oral argument.

3

I.

A.

The Clean Air Act requires the EPA Administrator "to control air pollution from Outer Continental Shelf sources located offshore of the States" along much of the nation's coastline, including the Pacific Coast. 42 U.S.C. § 7627(a)(1). The "Outer Continental Shelf" (OCS) refers to "all submerged lands lying seaward and outside of the area of lands beneath navigable waters . . . and of which the subsoil and seabed appertain to the United States and are subject to its jurisdiction and control." 43 U.S.C. § 1331(a). OCS "sources" subject to the Clean Air Act "include any equipment, activity, or facility" that "emits or has the potential to emit any air pollutant," including "platform and drill ship exploration, construction, development, production, processing, and transportation." 42 U.S.C. § 7627(a)(4)(C).

States adjacent to OCS sources may assume delegated authority for implementing and enforcing Clean Air Act requirements applicable to OCS sources. *See id.* § 7627(a)(3). If the Administrator determines that a State's proposed regulations are adequate, "the Administrator shall delegate to that State any authority the Administrator has . . . to implement and enforce such requirements." *Id.*

In 1994, the Ventura County Air Pollution Control District requested the delegated authority to implement and enforce OCS regulations within 25 miles of California's seaward boundary. EPA approved the request, and the District and EPA entered into an agreement governing the delegation. Under the delegation agreement, the District issues the required OCS permits to operators. EPA may review the permits for consistency with federal regulations. The agreement also

provides that the District will request EPA guidance on certain matters involving the interpretation of the Clean Air Act.

B.

Petitioner Chevron U.S.A. Inc. formerly operated two oil and gas platforms—the Gail and Grace platforms—located on the OCS within 25 miles of Ventura County, California. Chevron sold the Gail and Grace platforms to another operator in 1999. The successor abandoned the lease without decommissioning the platforms. The Department of Interior's Bureau of Safety and Environmental Enforcement then directed Chevron to decommission the platforms.

Decommissioning is the process of ending oil and gas operations at a platform and removing associated equipment. *See* 30 C.F.R. § 250.1700(a). Given the size of oil platforms and the scale of their operations, decommissioning proceeds in several stages and can take years to complete. The first phases are known as Pre-Abandonment and Abandonment, and they consist in part of plugging the platform's oil and gas wells and preparing the topside (the portion of the platform above the water) for removal. The next two phases involve removal of the topside and then of the jacket (the portion of the platform that formerly held the topside and is positioned on the ocean floor). The final phases entail removal of debris and processing and disposal of platform components onshore.

The Gail and Grace platforms are OCS sources and thus are subject to operating permits issued by the District under Title V of the Clean Air Act. *See* 42 U.S.C. § 7627(a)(4)(C); 40 C.F.R. § 55.6. In September 2020, as part of its decommissioning preparation, Chevron requested guidance from EPA. Chevron inquired whether, following the completion of the Pre-Abandonment and Abandonment

phases, the platforms would continue to qualify as OCS sources subject to permitting requirements. Letter from Walid Masri, Program Dir., W. Coast Decommissioning Program, Chevron U.S.A. Inc., to Anne Austin, Principal Deputy Assistant Adm'r for the Office of Air and Radiation, Env't Protection Agency (Sept. 8, 2020), J.A. 112–20 [Chevron Ltr.]. Chevron contended that, following Pre-Abandonment and Abandonment, the platforms would no longer emit or have the potential to emit any air pollutant and thus should no longer qualify as OCS sources. *Id.* at 2, J.A. 113.

In January 2021, EPA sent an initial letter responding to Chevron. Letter from Karl Moor, Deputy Assistant Adm'r for the Office of Air and Radiation, Env't Protection Agency, to Walid Masri, Program Dir., W. Coast Decommissioning Program, Chevron U.S.A. Inc. (Jan. 19, 2021), J.A. 121–26 [Jan. Ltr.]. EPA stated that the Gail and Grace platforms "will cease to be [OCS] sources following the completion of the Pre-Abandonment and Abandonment phases of the decommissioning process" described by Chevron. *Id.* at 1, J.A. 121. The agency reasoned that, once the platforms no longer emitted or had the potential to emit pollutants per Chevron's representation, the platforms would no longer meet the OCS source definition. *Id.* at 4–5, J.A. 124–25.

In April 2021, EPA sent a second letter to Chevron revising the position taken in the January letter. Letter from Joseph Goffman, Acting Assistant Adm'r, Env't Protection Agency, to Walid Masri, Program Dir., W. Coast Decommissioning Program, Chevron U.S.A. Inc. (Apr. 20, 2021), J.A. 127–30 [Apr. Ltr.]. The agency explained that the January letter "did not sufficiently evaluate the possibility that additional activity conducted at the site or equipment used to dismantle the Platforms after the Pre-Abandonment and Abandonment phases may be classified as an 'OCS source'

under certain conditions." *Id.* at 2, J.A. 128. Whether Chevron would require an OCS permit for the platforms at that time thus would depend "on whether other equipment or facilities brought to the site (e.g., vessels or barges) or new activities conducted at the site qualify as an OCS source for some period after the completion of" those phases. *Id.* EPA further noted that the dismantling, demolition, or deconstruction of a platform could be "viewed to be similar" to the non-exclusive list of activities included in the statutory definition of OCS source—platform and drill ship exploration, construction, development, production, processing, and transportation. *Id.* at 3, J.A. 129.

The agency also emphasized that it had "failed to recognize" in the January letter "that the delegated OCS permitting authority for the Platforms, the Ventura County Air Pollution Control District . . . is the appropriate authority to make an applicability determination in this case, in consultation with EPA, after a more detailed evaluation of the activities to be conducted and equipment to be used at the site after the Pre-Abandonment and Abandonment phases [are] completed." *Id.* at 2, J.A. 128. "Given the importance of these facts to this determination," EPA explained, it "encourage[d] [Chevron] to provide detailed information to the District about Chevron's proposed decommissioning activities so that the District can take such information into account" in determining the applicability of OCS requirements. *Id.* at 3, J.A. 129.

Chevron filed a petition for review of the April letter in this court. Chevron challenges the interpretation advanced by EPA in its April letter as inconsistent with the terms of the Clean Air Act. EPA defends the interpretation in the April letter on the merits, but also first raises various threshold grounds for dismissing Chevron's petition, including that the letter was not final agency action and that venue for this action

lies only in the Ninth Circuit. Chevron, anticipating the venue objection, filed a protective petition for review in the Ninth Circuit at the same time it filed its petition for review in this court. *See Chevron U.S.A. Inc. v. EPA*, No. 21-71132 (9th Cir. June 21, 2021). Those proceedings have been held in abeyance pending resolution of this petition.

## II.

We do not reach the merits of Chevron's challenge because we conclude that venue in this matter lies exclusively in the Ninth Circuit. We begin by explaining that we can dismiss the petition on venue grounds without first needing to decide whether the petition seeks review of a final agency action. We then determine that EPA's challenged action—the agency's April letter to Chevron—is "locally or regionally applicable" rather than "nationally applicable," such that Chevron's challenge belongs in the Ninth Circuit rather than in our court. 42 U.S.C. § 7607(b)(1).

## A.

As threshold grounds for dismissing Chevron's petition for review, EPA argues both that the April letter is not final agency action and that venue over Chevron's challenge lies in the Ninth Circuit. The Clean Air Act's requirement of a final agency action is jurisdictional. *See Valero Energy Corp. v. EPA*, 927 F.3d 532, 536 (D.C. Cir. 2019). The Clean Air Act's venue requirements, on the other hand, are nonjurisdictional. *See Sierra Club v. EPA*, 926 F.3d 844, 848 (D.C. Cir. 2019). The question thus arises whether we can decide this matter on a nonjurisdictional venue ground without first resolving whether the April letter is final agency action such that we would have jurisdiction to review it.

*Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83 (1998), established "that a federal court generally may not rule on the merits of a case without first determining that it has jurisdiction." *Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 430–31 (2007) (citing *Steel Co.*, 523 U.S. at 93–102). But, while a court "may not rule on the merits of a case" without jurisdiction, it can consider certain threshold, non-merits grounds without needing to resolve its jurisdiction. *Id.* at 430–31. In other words, "*Steel Co.*'s rule of priority does not invariably require considering a jurisdictional question before *any* nonjurisdictional issue. Rather, courts may address certain nonjurisdictional, threshold issues before examining jurisdictional questions." *Kaplan v. Cent. Bank of the Islamic Republic of Iran*, 896 F.3d 501, 513 (D.C. Cir. 2018).

Here, the question is whether venue is the kind of threshold, nonjurisdictional issue that can be addressed without first examining jurisdiction. An "issue can qualify as a threshold one of that kind only if it can occasion a '[d]ismissal short of reaching the merits.'" *Id.* (quoting *Sinochem*, 549 U.S. at 431)). Venue fits squarely in that category. The Supreme Court's decision in *Sinochem* directly points the way to that conclusion.

*Sinochem* considered "whether *forum non conveniens* can be decided prior to matters of jurisdiction." 549 U.S. at 428–29. The Supreme Court answered yes, explaining that a "*forum non conveniens* dismissal denies audience to a case on the merits; it is a determination that the merits should be adjudicated elsewhere." *Id.* at 432 (citation, alteration, and quotation marks omitted). The "critical point . . . rendering a *forum non conveniens* determination a threshold, nonmerits issue," the Court reasoned, "is simply this: Resolving a *forum non conveniens* motion does not entail any assumption by the

court of substantive law-declaring power." *Id.* at 433 (quotation marks omitted).

All of that is equally true of venue. Venue, like *forum non conveniens*, involves "a determination that the merits should be adjudicated elsewhere." *Id.* at 432. And when a court disposes of a case on grounds of improper venue, the court does not draw upon its "substantive law-declaring power." *Id.* at 433 (quotation marks omitted). As is the case with *forum non conveniens*, venue involves a "[d]ismissal short of reaching the merits," such that "the court will not proceed at all to an adjudication of the cause." *Id.* at 431 (quotation marks omitted); *see Kaplan*, 896 F.3d at 513. Indeed, the Supreme Court has "characterized *forum non conveniens* as, essentially, a supervening venue provision," and the general federal change-of-venue statute, 28 U.S.C. § 1404(a), codifies the "common-law doctrine of *forum non conveniens*." *Sinochem*, 549 U.S. at 429–30 (quotation marks and citation omitted). The close association between *forum non conveniens* and venue cements the conclusion that venue, like *forum non conveniens*, is a threshold, non-merits issue that a court can address without first establishing its jurisdiction. *Accord ATK Launch Sys., Inc. v. EPA*, 651 F.3d 1194, 1200 (10th Cir. 2011); *In re LimitNone, LLC*, 551 F.3d 572, 576–77 (7th Cir. 2008).

B.

Having determined that we may dismiss Chevron's petition for review for improper venue without first deciding whether EPA's April letter constituted final agency action, we now proceed to address the venue question.

The Clean Air Act's venue provision states in relevant part:

A petition for review of action of the Administrator in promulgating any national primary or secondary ambient air quality standard . . . or any other nationally applicable regulations promulgated, or final action taken, by the Administrator under this chapter may be filed only in the United States Court of Appeals for the District of Columbia. A petition for review of the Administrator's action in approving or promulgating any implementation plan . . . or any other final action of the Administrator under this chapter . . . which is locally or regionally applicable may be filed only in the United States Court of Appeals for the appropriate circuit. Notwithstanding the preceding sentence a petition for review of any action referred to in such sentence may be filed only in the United States Court of Appeals for the District of Columbia if such action is based on a determination of nationwide scope or effect and if in taking such action the Administrator finds and publishes that such action is based on such a determination.

42 U.S.C. § 7607(b)(1).

That provision sets out "two routes for venue to be proper in this court." *Sierra Club*, 926 F.3d at 849. First, EPA's challenged "action may itself be nationally applicable." *Id.* "Second, EPA's Administrator may determine that the otherwise locally or regionally applicable action has nationwide scope or effect and publish his finding." *Id.* Here, no one contends that the Administrator made the requisite

finding about the April letter for purposes of the second route, so the first route is the only one available to Chevron.

The dispositive question, then, is whether the April letter is "nationally applicable" or "locally or regionally applicable." In answering that question, we "look only to the face of the agency action, not its practical effects." *Id.*; *see Dalton Trucking, Inc. v. EPA*, 808 F.3d 875, 881 (D.C. Cir. 2015). The quintessential example of a "nationally applicable" EPA action that may be challenged only in this court is a regulation that uniformly applies nationwide. *See NRDC v. Thomas*, 838 F.2d 1224, 1249 (D.C. Cir. 1988). At the other end of the spectrum, approving or promulgating a State Implementation Plan "is the prototypical 'locally or regionally applicable' action that may be challenged only in the appropriate regional court of appeals." *Am. Rd. & Transp. Builders Ass'n v. EPA*, 705 F.3d 453, 455 (D.C. Cir. 2013).

The April letter falls comfortably in the category of "locally or regionally applicable" actions. Our recent decision in *Sierra Club v. EPA* is instructive. There, we held that an EPA order denying Sierra Club's petition for objection to renewal of an operating permit was locally or regionally applicable. *See Sierra Club*, 926 F.3d at 849. We reasoned that the order "denies Sierra Club's petition for objection to a single permit for a single plant located in a single state," and it thus had "immediate effect" only for that power plant. *Id.* We also emphasized that the Administrator confined his "novel interpretation of Title V" of the Clean Air Act "to the specific circumstances" of the individual power plant in question. *Id.* at 850.

Under the logic of *Sierra Club*, the April letter, too, is locally or regionally applicable. The letter's subject line reads: "Additional Environmental Protection Agency (EPA) Views

on Outer Continental Shelf Decommissioning Activities at Chevron U.S.A. Inc. Gail and Grace Platforms." Apr. Ltr. 1, J.A. 127. That subject line conveys EPA's intention to set forth views pertaining to the Gail and Grace platforms in particular. The letter correspondingly "has immediate effect" only on Chevron's decommissioning activities at those platforms. *Sierra Club*, 926 F.3d at 849. The letter immediately affects no other platforms in the OCS nor any decommissioning activities outside those conducted at Chevron's two facilities. It speaks to decommissioning activities occurring at two specific platforms off the coast of Ventura County, California, in the Ninth Circuit's region.

The April letter reconfirms in numerous ways its focus on the specific circumstances of the decommissioning activities at the Gail and Grace platforms. The letter references the need to evaluate "the activities to be conducted and equipment to be used *at the site*"; to consider "whether other equipment or facilities brought *to the site* (e.g., vessels or barges) or new activities conducted *at the site* qualify as an OCS source"; and to understand "Chevron's proposed decommissioning process *for the Platforms*, including the type of equipment to be used." Apr. Ltr. 2–3, J.A. 128–29 (emphasis added). In those respects, the April letter, like EPA's action in *Sierra Club*, focuses by its terms on "the circumstances presented here" in an "avowedly case-specific" analysis. 926 F.3d at 850 (quotation marks omitted). And the April letter also emphasizes the central role played by the local agency, the "Ventura County Air Pollution Control District," as "the appropriate authority to make an applicability determination in this case"—a consideration firmly in keeping with a locally applicable determination but markedly incongruous with a nationally applicable one. Apr. Ltr. 2, J.A. 128.

It is true that, in the course of the April letter, EPA construed and applied nationally applicable provisions of the Clean Air Act and their implementing regulations. But many locally or regionally applicable actions may require interpretation of the Clean Air Act's statutory terms, and that kind of interpretive exercise alone does not transform a locally applicable action into a nationally applicable one. We thus explained in *Sierra Club* that if "EPA relies on the statutory interpretation set forth in the Order" under review in that case "in future adjudications or other final agency action, it will be subject to judicial review upon challenge." 926 F.3d at 849. And the fact "[t]hat the interpretative reasoning offered by the Administrator in denying Sierra Club's petition for objection has precedential effect in future EPA proceedings is typical of adjudicative orders, *including regionally and locally applicable ones*." *Id.* at 850 (emphasis added). As a result, that a challenged action "applies a broad regulation to a specific context" and "may set a precedent for future . . . proceedings" does not make it nationally applicable. *Am. Rd. & Transp. Builders Ass'n*, 705 F.3d at 456.

Chevron argues that, because EPA's April letter displaced its previous, January letter, and because the January letter was a nationally applicable action, the April letter must be nationally applicable as well. Chevron's challenge is solely to the April letter, not the January one. And we do not take as a given that a nationally applicable action could be displaced only by another nationally applicable action: one could imagine situations in which EPA might withdraw a nationally applicable resolution in favor of a locally applicable one. At any rate, even assuming Chevron is correct that the April letter would be considered nationally applicable if the January one was too, we disagree with Chevron's assumption about the January letter.

14

As with the April letter, the face of the January letter speaks in localized terms. The subject line of the January letter reads: "Applicability Determination for Outer Continental Shelf Decommissioning Activities at Chevron U.S.A. Inc. Gail and Grace Platforms." Jan. Ltr. 1, J.A. 121. And the letter's immediate effects were correspondingly confined, contemplating that Chevron could surrender its OCS permits only for those platforms. EPA explicitly stated, moreover, that the letter was "predicated on the specific facts described in the September 8, 2020 Chevron Letter." *Id.* at 2, J.A. 122. And the agency added that, "*[u]nder the specific circumstances described in the Chevron Letter*, EPA agrees with Chevron that the Platforms would cease to be OCS sources after the Pre-Abandonment and Abandonment phases described by Chevron, and, therefore, would no longer [be] subject to requirements applicable to OCS sources." *Id.* at 4, J.A. 124 (emphasis added). EPA similarly emphasized that "*under the specific circumstances described in the Chevron Letter*, EPA concludes that associated vessel emissions alone are not sufficient to satisfy the potential to emit criteria of the OCS source definition." *Id.* (emphasis added).

In short, as it did in the April letter, EPA repeatedly confined the January letter to the specific, local circumstances under which it arose. That bespeaks a locally or regionally applicable action, not a nationally applicable one. *See Sierra Club*, 926 F.3d at 850. Venue over a challenge to such an action does not lie in our court, but lies exclusively in the "appropriate circuit," 42 U.S.C. § 7607(b)(1)—here, the Ninth Circuit, where Chevron has filed a protective petition for review. We thus dismiss Chevron's petition for review in this court, enabling its Ninth Circuit action to proceed.

15

\* \* \* \* \*

For the foregoing reasons, we dismiss Chevron's petition for review for lack of venue without reaching the merits.

*So ordered.*